**Ellen M. PECK, Plaintiff–Appellant,**

v.

**PUBLIC SERVICE MUTUAL INSURANCE COMPANY, Defendant–Appellee,**

**Greater New York Mutual Insurance Company, Defendant.**

No. 01–9459.

United States Court of Appeals, Second Circuit.

Argued: Oct. 1, 2002.

Decided: April 17, 2003.

John W. Mills, Murphy and Karpie, LLC, Bridgeport, CT, for Plaintiff–Appellant.

Oliver B. Dickins, Simsbury, CT, for Defendant–Appellee.

Before: MINER, SOTOMAYOR, and KATZMANN, Circuit Judges.

MINER, Circuit Judge.

Plaintiff-appellant Ellen M. Peck appeals from a summary judgment entered in the United States District Court for the District of Connecticut (Goettel, *J.*) dismissing her action to recover damages from defendant-appellee Public Service Mutual Insurance Company ("Public Service") under Connecticut's direct action statute, Conn. Gen.Stat. § 38a–321 (2000). This action arises out of an underlying tort action brought by Peck in Connecticut Superior Court against, inter alia, South Norwalk Redevelopment Limited Partnership ("South Norwalk"). South Norwalk never notified its insurer, Public Service, of Peck's tort action. A default judgment was subsequently entered against South Norwalk as a result of its failure to respond to Peck's outstanding discovery requests, and a jury later awarded Peck $250,000 in damages. As part of a settlement with Peck, South Norwalk assigned to her whatever claims it had against Public Service.

After Peck filed the instant diversity action against Public Service, the latter moved for summary judgment on several grounds, one of which was that Public Service had been materially prejudiced by South Norwalk's failure to provide it with timely notice of Peck's underlying tort action. It was solely upon this ground that the District Court entered summary judgment for Public Service and dismissed Peck's complaint. For the reasons set forth below, we conclude that the District Court erred in holding as a matter of law that Peck failed to carry her burden of showing that Public Service was not materially prejudiced by any untimely notice Public Service received of Peck's underlying tort action. Accordingly, we vacate the summary judgment and remand the case to the District Court for proceedings consistent with this opinion.

## BACKGROUND

### I. Events Leading Up to Peck's Underlying Tort Action

South Norwalk, a Connecticut limited partnership, owned the Washington Market Building in South Norwalk, Connecticut. On May 12, 1992, South Norwalk entered into a ten-year commercial lease with Rattlesnake Ventures, Inc. ("Rattlesnake"), a Connecticut corporation, for premises in Washington Market Building to be used for the operation of a "full-service restaurant" called the Rattlesnake Bar and Grill. The lease required, in relevant part, that Rattlesnake purchase commercial liability insurance, that Rattlesnake name South Norwalk as an additional insured on the policy, and that Rattlesnake deposit the policy with South Norwalk.

Peck owned and resided in a condominium unit located directly above the premises leased by Rattlesnake in the Washington Market Building. In or about October 1992, live rock and roll bands began performing several nights a week between the hours of 9:00 p.m. and 2:00 a.m. at the Rattlesnake Bar and Grill. According to Peck, these live performances resulted in "incredibly loud noises and vibrations ... emanat[ing]" into the street and throughout her condominium unit, in violation of local noise ordinances. Peck's complaints to the Rattlesnake Bar and Grill about the noise went unremedied. Instead, Peck alleged that she was subjected to "vulgar and obscene comments" from the staff of the Rattlesnake Bar and Grill and threatened with physical harm. On one occasion, Peck claimed that someone spread cooking grease on the stairs leading to her condominium.

### II. Peck's Filing of the Underlying Tort Action and South Norwalk's Bankruptcy Filing

Neither the noise nor Peck's distaste for the late night rock and roll music abated. Consequently, on June 23, 1994, Peck filed suit in Connecticut Superior Court against Rattlesnake, South Norwalk, and William Opper, the President of Rattlesnake, pleading causes of action for negligence per se, intentional and negligent infliction of emotional distress, and violations of Connecticut's Unfair Trade Practices Act, Conn. Gen.Stat. §§ 42–110b et seq. In particular, Peck alleged that she had been "routinely and regularly ... subjected to excessively loud music, vibration, and crowd noise ... on an ongoing, regular basis since October 1992," resulting in: "[r]egular loss of sleep"; "[n]eedless anxiety and severe emotional distress"; "[r]egular deprivation of her rightful enjoyment to the peace, quiet and enjoyment of her home"; and "[s]evere impairment to the value of and diminution in her dwelling place." She sought money damages and injunctive relief. Five days after Peck's

complaint was filed, attorney G. Kenneth Bernhard of the Law Firm Goldstein and Peck, P.C.[1] entered an appearance on behalf of "[a]ll defendants."

On August 15, 1994, South Norwalk filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut.[2] Two weeks later, Peck filed a Revised Complaint, and on October 6, Rattlesnake and Opper filed their answer. On December 6, 1994, attorney Paul L. McCullough filed a notice of appearance for South Norwalk. McCullough had represented South Norwalk in connection with the Rattlesnake lease.

### III. *The Public Service Insurance Policy*

It was not until January 10, 1995— more than six months after the underlying tort action was commenced and about five months after South Norwalk filed for bankruptcy—that Public Service, a New York corporation, issued an insurance policy to Rattlesnake, naming South Norwalk as an additional insured. The policy defined the policy period as "12/01/94 to 12/01/95 12:01 a.m." The policy further provided that it applied to "bodily injury" or "property damage" only if the "bodily injury" or "property damage" occurred "during the policy period." The policy defined "bodily injury" as "bodily injury, sickness or disease sustained by a person" and "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property."

Finally, South Norwalk was required to notify Public Service "as soon as practicable" of any occurrence that might result in a claim or of any claim or suit, and "immediately" to send copies of any demands, notices, summonses, or legal papers received in connection with a claim or lawsuit.

### IV. *The Underlying Litigation Progresses and Rattlesnake Notifies Public Service of the Underlying Tort Action*

On January 23, 1995, the law firm of Gildea & Stevens, which had been retained by another Rattlensake insurer, Greater New York Mutual Insurance Company,[3] filed a notice of appearance on behalf of Rattlesnake and Opper. On March 23, attorney Thomas E. Stevens of Gildea & Stevens filed an amended answer and special defense on behalf of Rattlesnake and Opper. The following month, Peck made an offer to Rattlesnake, agreeing to accept $75,000 in full settlement of her claims. The offer was rejected.

By letter dated September 8, 1995, attorney Eugene E. Cedarbaum of Goldstein and Peck, requested that Ronald Fitelson, Rattlesnake's insurance broker, notify Public Service of the underlying tort action. Four days later, Fitelson faxed to Public Service a Loss Notice and the Summons, which separately listed each defendant in the underlying action. Fitelson also instructed Public Service to contact attorney Cedarbaum. On September 14, Daniel Jaconetti, the head of litigation at

---

**1.** There is no indication that this Peck, a member of the firm acting on behalf of Rattlesnake and Opper, had any relationship to the plaintiff Peck in the underlying action.

**2.** Peck's motion to lift the automatic stay of her tort action against South Norwalk was granted on February 9, 1996, after several prior attempts to lift the stay had failed.

**3.** In addition to the insurance purchased from Public Service, Rattlesnake also purchased insurance policies from Greater New York Mutual Insurance Company and the Aetna insurance company, naming only itself as insured.

Public Service, set up a claims file and filled out a "Claims Division Transaction Sheet." The following day, he opened a claims file in which he made handwritten notes about the claims alleged in Peck's complaint, and assigned the file to insurance adjuster Barry Blecher. As to the Ninth and Tenth Counts of the complaint, which alleged negligence per se and negligent infliction of emotional distress against South Norwalk, Jaconetti wrote "Possibly Depending upon lease Agr. and if Co-△ is ADD'l. INSD. on Policy." Jaconetti also wrote "Has Co-△ Sought Def. + Indem. From Insd?" and "Has Anyone Answered For Co-△ Yet?"

On September 29, attorney Cedarbaum forwarded a copy of Peck's August 1994 Revised Complaint to Public Service. On October 5, Blecher faxed a two-page document to Cederbaum, asking him to identify South Norwalk and whether it was the landlord of the property leased by Rattlesnake. A week later, Blecher sent another letter to attorney Cederbaum confirming receipt of the original summons and complaint, the Revised Complaint, and explaining that he needed a copy of the lease to help Public Service determine its "position regarding the availability of coverage." On October 20 attorney Cederbaum sent Blecher copies of various papers pertaining to the litigation, and indicated that he would soon send a copy of the lease. Additionally, Cederbaum informed Blecher that "[t]he premises on which the restaurant is located is rented from South Norwalk" and that Peck's deposition was scheduled for October 26.

In early November, Public Service received a copy of the lease agreement. On November 28, Public Service sent a letter to Rattlesnake denying insurance coverage to Rattlesnake on the grounds that (1) the date of the loss was October 1992, prior to the 1994 effective date of the policy; (2) notice of the claim was not timely provided by Rattlesnake (over a year after service of the complaint); and (3) intentional acts were excluded from the policy's coverage. No disclaimer of coverage was ever sent to South Norwalk, and South Norwalk was not referred to in the letter.

## V. Default Judgment Entered Against South Norwalk in the Underlying Tort Action

On August 28, 1996—six months after the automatic stay in the South Norwalk bankruptcy proceeding was lifted with respect to Peck's action against South Norwalk—Peck served South Norwalk with interrogatories and document production requests. South Norwalk failed to respond to these discovery requests, and by motion dated November 25, 1996, Peck moved for the entry of a default against South Norwalk. A copy of the notice was sent to attorney McCullough, among others. A default judgment was entered against South Norwalk on July 21, 1997.

## VI. The Underlying Action Proceeds to Trial Without South Norwalk's Participation

In April 1997, Peck filed an offer of judgment to settle the case against South Norwalk for $25,000, which was never accepted. On May 29, 1998, attorney Brian M. Gildea of Gildea and Associates entered an appearance in the underlying action on behalf of "[a]ll defendants," although attorney McCullough had previously appeared for South Norwalk. On June 1, 1998, Peck filed an Amended Complaint that was substantially similar to the original complaint. The only difference was the addition of allegations pertaining to the injuries sustained by Peck.[4]

**4.** The Amended Complaint also may have been filed to bring the alleged misconduct of

At a July 1998 pretrial conference (at which attorney Gildea was in attendance), attorney McCullough indicated that he would not be participating in the trial because of his belief (later admitted by him to have been mistaken) that South Norwalk's liability to Peck had been discharged in the bankruptcy proceeding (which he believed had been converted from a Chapter 11 into a Chapter 7 proceeding).[5] McCullough also indicated at the pretrial conference his belief that Peck's claim was covered by insurance, although he stated that he did not know the identity of the insurance company providing coverage. The Superior Court judge explained to McCullough that it was up to him and his client "to notify the insurance company" of the claim and that if the insurer wanted "to come in and ask for a continuance," the court would consider such a request. The court continued: "So if you could notify the insurance company as soon as possible I would appreciate it .... Actually not appreciated. I will order it." Notwithstanding this unequivocal "order," McCullough later admitted that he never notified Public Service.

Immediately upon overhearing the colloquy between the Superior Court judge and attorney McCullough concerning the notice to South Norwalk's insurer, attorney Gildea notified a claims handler at Public Service that the trial in the case was scheduled to commence shortly and that South Norwalk's counsel had been given

permission not to attend. According to Gildea, the claims handler responded that Public Service "had closed [its] file on this matter, and had no intention of hiring defense counsel or taking any other steps to get involved in the litigation." The trial proceeded to verdict without South Norwalk's participation, Rattlesnake and Opper being defended by the two other insurers that insured only Rattlesnake, and McCullough testifying as a fact witness in Peck's rebuttal case. On or about August 4, 1998, the jury returned a verdict against the defendants, and awarded damages in the amount of: (1) $225,000 against Rattlesnake and Opper on the negligence per se claims; (2) $200,000 against Rattlesnake on the negligent or intentional infliction of emotional distress claims; (3) $200,000 against Opper on the negligent or intentional infliction of emotional distress claims; and (4) with respect to the default judgment against South Norwalk, $250,000.[6] Subsequently, Rattlesnake and Opper filed various motions to set aside the verdict or for remittiturs.

Attorney Cederbaum notified Public Service of the verdict in a September 1998 letter and invited the insurer to participate in post-judgment efforts to settle or appeal the case. The following month, Blecher responded by requesting a copy of the trial transcript. On November 19, 1998, the Superior Court granted Rattlesnake's and Opper's request to set aside the $200,000

South Norwalk within the period that South Norwalk was covered by the Public Service policy. The allegations made clear that Peck sustained injuries "on an ongoing, regular basis since October 1992," i.e., up to and including the filing date of the Amended Complaint.

**5.** Indeed, an examination of the Bankruptcy Court's docket reveals not only that there had been no discharge, but also that the bankruptcy petition had been voluntarily dismissed in May of 1997—two months before the default

judgment against South Norwalk was entered.

**6.** It is not clear from the record (1) why there was a $25,000 discrepancy between the damages assessed against Rattlesnake and South Norwalk; and (2) whether these damages were cumulative so that any sums paid by Rattlesnake would also satisfy South Norwalk's judgment or whether they were "independent" damages.

awarded to Peck for negligent or intentional infliction of emotional distress, finding those injuries to have been compensated in the jury's award on the negligence per se counts. Final judgment was entered on November 20, 1998.

On April 4, 1999, counsel for Peck sent a letter to Blecher confirming the tort judgment, indicating that "[i]n accordance with the lease agreement [between South Norwalk and Rattlesnake], South Norwalk ... was named as an additional insured ..., and properly appears as such on the declarations page," and formally demanding that Public Service "satisfy" the judgment rendered against South Norwalk. In September 1999, as part of a settlement with Rattlesnake and Peck, South Norwalk assigned whatever claim(s) it had against Public Service to Peck in exchange for one dollar and a covenant contained in a subsequent letter from Peck not to pursue any claims against South Norwalk for any judgment not covered by insurance and to limit her recovery to the available insurance proceeds.

## VII.  *Proceedings in the District Court*

In May 1999, Peck sued Public Service as assignee and subrogee of South Norwalk in the District Court under Connecticut's direct action statute, Conn. Gen.Stat. § 38a–321.[7] The Complaint was amended on April 5, 2000, and alleged that Public Service (1) breached its insurance contract with South Norwalk; (2) breached the implied covenant of good faith in that contract; (3) violated the Connecticut Unfair Insurance Practices Act, *id.* §§ 38a–815 et seq.; (4) violated Connecticut's Unfair Trade Practices Act, *id.* §§ 42–110b et seq.; and (5) breached its duty to Peck, who was alleged to be a third-party beneficiary of the insurance contract. In June 2001, Public Service moved for summary judgment on the grounds that (1) South Norwalk failed to provide timely notice of the claim, (2) there was no coverage due to

the fact that the underlying action was filed before the policy's effective date, and (3) there was no coverage due to the fact that the injuries alleged by Peck were not covered by the policy.

In a November 11, 2001 unpublished decision and order, the District Court granted summary judgment for Public Service solely on the late notice defense. Applying Connecticut law, the District Court interpreted the notice language in the insurance policy as meaning "within a reasonable period of time under the circumstances of the case." The District Court then proceeded to examine the evidence regarding timeliness of the notice, commenting that it was "uncontested that [South Norwalk] did not comply with the policy requirement that it provide [Public Service] with notice of the suit as soon as practicable nor did it send copies of the legal papers to its insurer." Indeed, South Norwalk "never specifically asked for representation or a defense, apparently believing that, because the suit had begun before the policy went into effect, there would be no coverage." Instead, the District Court observed, South Norwalk undertook its own defense, which the District Court characterized as, "if not a sham, an absolute disaster."

The District Court then concluded that Peck had failed to satisfy her burden under Connecticut law of showing that Public Service was not materially prejudiced by South Norwalk's failure to give timely notice of the underlying action. According to the District Court, it was "hard to imagine any greater prejudice to [Public Service] than a demand for payment of a default judgment of which it was totally ignorant and as to which, through [South Norwalk's] failure to comply with the terms of the contract, [Public Service] has been deprived of its right to defend." Indeed,

---

**7.**  Greater New York Mutual Insurance Company also was named as a defendant in this lawsuit but was dismissed by stipulation on April 4, 2000.

because South Norwalk failed to cure the default and defend on the merits, the District Court opined that an argument could be made that South Norwalk "was colluding with [Peck] since ultimately it was assured that neither it nor its general partners would be subject to any claim." Accordingly, summary judgment was granted without reaching the other arguments advanced by Public Service.

Peck subsequently moved for reconsideration of the District Court's decision and for relief from the judgment, arguing, inter alia, that by failing to send a letter to South Norwalk rejecting coverage or reserving its rights, Public Service had waived its late notice defense. The District Court denied the motions in another unpublished decision. This timely appeal followed.

## DISCUSSION

### I. *Standard of Review*

We review de novo the District Court's grant of summary judgment and construe the evidence in the light most favorable to Peck. *See McCarthy v. Am. Int'l Group*, 283 F.3d 121, 123 (2d Cir.2002). Summary judgment here would have been "appropriate if there [were] no genuine issues of material fact" and Public Service had been "entitled to judgment as a matter of law." *Id.* at 123–24 (citing Fed.R.Civ.P. 56(c)). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict" for Public Service. *Id.* at 124 (internal quotation marks omitted). Thus, with respect to the issue of whether Public Service was materially prejudiced, if there were "any evidence in the record from which a reasonable inference could be drawn in favor of [Peck], summary judgment [would be] improper." *id.* (internal quotation marks omitted). Where the non-moving party bears the burden of proof on an issue, as Peck does here on the issue of material prejudice. *see infra*, Public Service as the moving party may satisfy this burden by

"informing the district court of the basis of its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In response, to survive summary judgment, Peck must "come forward with specific facts showing that there [was] a genuine issue for trial" on the issue of material prejudice. *McCarthy*, 283 F.3d at 124 (internal quotation marks omitted); *see also Celotex, 477 U.S. at 323, 106 S.Ct. 2548 ("The moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof")*. In light of the theory on which the district court granted summary judgment in favor of Public Service, we think that Peck has done so here.

### II. *Connecticut Law Governing Timely Notice and Prejudice*

In *Aetna Casualty & Surety Co. v. Murphy*, 206 Conn. 409, 538 A.2d 219 (1988), the Connecticut Supreme Court articulated the legal analysis to be applied in a duty to defend case when an insurer raises the defense that its insured failed to comply with the policy's requirement that it provide the insurer with timely notice of a claim. There, the court held that, "[i]f it can be shown that the insurer suffered no material prejudice from the delay, the non-occurrence of the condition of timely notice may be excused because it is not ... a material part of the agreed exchange." *Id.* at 223 (internal quotations omitted). Furthermore, because the insured "is seeking to be excused from the consequences of a contract provision with which [it] has concededly failed to comply," the "burden of establishing lack of prejudice must be borne by the insured," and "the existence or nonexistence of prejudice from delayed notice should be determined on a factual basis." *Id.* at 224.

The rationales underlying this rebuttable presumption that prejudice follows from untimely notice are that the purpose of the notice provision " 'is to give the insurer an opportunity to make a timely and adequate investigation of all the circumstances' " and that, " 'if the insurer is thus given the opportunity for a timely investigation, reasonable compromises and settlements may be made, thereby avoiding prolonged and unnecessary litigation.' " *Id.* at 223 (quoting 8 J. Appleman, *Insurance Law and Practice* § 4731, at 2–5 (rev. ed.1981)). This "legitimate purpose of guaranteeing [an insurer] a fair opportunity to investigate accidents and claims can be protected without the forfeiture that results from presuming, irrebuttably, that late notice invariably prejudices the insurer." *Id.* at 222.

■ According to Connecticut law, determining whether untimely notice is prejudicial "requires a factual inquiry into ... the circumstances" surrounding each case in order to strike "a proper balance between the interests of the insurer and the insured." *Id.* at 223. However, Connecticut's courts have not provided specific guidance on what constitutes "material prejudice" in an untimely notice case.

III. *Whether There Were Genuine Issues of Material Facts Concerning Notice to, and Material Prejudice Suffered by, Public Service?*

■ Here, the District Court's conclusion that Peck failed as a matter of law to meet her burden to demonstrate that Public Service was materially prejudiced was based on the findings that Public Service was subjected to a "demand for payment of a default judgment of which it was totally ignorant" and that "Public Service ha[d] been deprived of its right to defend." Our review of the evidence presented on the motion for summary judgment leads us to conclude that whether Public Service was "ignorant" of the case giving rise to the default judgment and thus whether it was completely "deprived of its right to defend" present unresolved questions of fact.

There are factual disputes concerning what Public Service knew about Peck's underlying tort action and when it knew it. Whereas the default judgment was not requested until November 1996 and was not granted until July 1997, Public Service received notice of the action against South Norwalk through Rattlesnake's counsel in September 1995, eight months after the policy was purchased (the earliest point at which notice could have been given) but almost two years before the default was entered. Whether notice from South Norwalk's coinsured/codefendant can serve as notice from South Norwalk, and thus whether the prejudice to Public Service should be measured only by the events prior to September 1995, present unresolved questions of Connecticut law and questions of fact, both of which should be addressed by the District Court in the first instance. For example, some jurisdictions have held that notice provided by one codefendant/coinsured is sufficient to satisfy the contractual notice obligation of another codefendant/coinsured only if the insurer receives actual notice that the other codefendant/coinsured was served with process. *See Campbell v. Cont'l Cas. Co.*, 170 F.2d 669, 671 (8th Cir.1948) (applying Missouri law and stating that "neither the language of the policy, nor the construction made by any court of such provisions as it contains, has imposed on the insurer, merely because it knows that an insured has been named as a defendant in an action, the sentry duty of tracking back and forth to the court house to keep a check on if or when he may be served with process."); *see also Indem. Ins. Co. v. Forrest*, 44 F.2d 465, 466 (9th Cir.1930); 14 Couch on Insurance §§ 199:97 (2002) (Westlaw online). Although the September 1995 notice was provided in the form of a summons naming South Norwalk as a defendant, the record

before us does not reveal whether Public Service received notice that South Norwalk was served with process.

Furthermore, presuming the September 1995 notice is valid as to South Norwalk, it is uncertain whether the Revised Complaint Public Service received could serve as notice of conduct for which Public Service could be liable during the coverage period running from December 1994 to December 1995. The Revised Complaint alleged personal and property damages sustained "on an ongoing, regular basis since October 1992 "; it was filed, however, in August 1994 before the policy period commenced. Whether the allegations in this complaint, combined with other information in the possession of Public Service, may serve as notice of conduct occurring after the complaint was filed presents both an unresolved question of Connecticut law and questions of fact that should be addressed by the District Court in the first instance, if necessary. Because of these same issues of timing, it is also unclear whether the default judgment, which was entered only on the basis of the Revised Complaint, could legally make Public Service liable for any occurrences during the policy period.

Additional evidence also suggests that Public Service was not ignorant of South Norwalk's involvement in the lawsuit, including Jaconetti's notations in the case file, Blecher's request from Rattlesnake's attorney for additional information regarding South Norwalk, and Public Service's receipt of the lease agreement requiring Rattlesnake to procure insurance and name South Norwalk as an additional insured. Under Connecticut law, the burden lies on Peck to demonstrate Public Service's lack of prejudice. However, at this point there is no evidence in the record that Public Service would have acted differently from September 1995 forward if it had received the notice directly from South Norwalk, given the reasons Public Service gave for disclaiming coverage in its November 1995 communication with Rattlesnake.

Our holding on the prejudice issue is limited. We hold only that the District Court erred in deciding as a matter of law that Public Service did not have sufficient notice of Peck's claims against South Norwalk at any point prior to the entry of the default judgment based on the record before it; we express no opinion whether Public Service may on remand meet its burden as the moving party on a summary judgment motion to demonstrate the absence of a genuine issue of material fact on the material prejudice issue. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548, based either on the same record and a different theory of prejudice, such as prejudice derived from the events prior to September 1995 (provided that the theory has not been waived in the district court), or on a more developed record responding to the showing Peck has made and clarifying the extent of the notice it received in September 1995. These are issues for the District Court to address in the first instance. Likewise, because the District Court declined to reach the contentions other than notice and prejudice advanced by Public Service in support of its motion for summary judgment, we express no opinion on them and remand them to the District Court.

## CONCLUSION

For the foregoing reasons, we vacate the summary judgment entered by the District Court and remand the case for further proceedings consistent with this opinion.