CAYUGA INDIAN NATION OF
NEW YORK, Plaintiff,

v.

VILLAGE OF UNION SPRINGS; Town of Springport; and County of Cayuga New York, Defendants.

No. 5:03–CV–1270.

United States District Court,
N.D. New York.

April 23, 2004.

Sonnenschein Nath & Rosenthall LLP, Attorneys for Plaintiff, New York, Raymond J. Heslin, Esq., Stephen L. Brodsky, Esq., of counsel.

Hiscock & Barclay, LLP, Attorneys for Defendants Village of Union Springs, Town of Springport and Town of Cayuga New York, Syracuse, Alan R. Peterman, Esq., Judith M. Sayles, Esq., of counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 131 |
| II. | BACKGROUND | 131 |
| III. | DISCUSSION | 134 |

A. Summary Judgment Standard......................................134
B. Indian Country.................................................135
 1. *City of Sherrill* & *Cayuga* Land Claim Cases ......................136
 2. Treaty of Buffalo Creek.......................................137
 3. Bureau of Indian Affairs Letter ...............................143
C. Exceptional Circumstances Test .................................144
D. Preliminary Injunction .........................................148
E. Attorneys Fees and Sanctions ...................................150

IV. CONCLUSION .....................................................151

## I. INTRODUCTION

The plaintiff, the Cayuga Indian Nation of New York ("the Nation"), a federally recognized Indian tribe,[1] filed suit against defendants, Village of Union Springs, Town of Springport, and County of Cayuga ("defendants"), seeking declaratory and injunctive relief regarding the nature of use of property that plaintiff owns within defendants' municipal boundaries ("the Property"). Defendants filed a counterclaim seeking declaratory and injunctive relief against plaintiff. Several motions in this action were denied, including various motions to dismiss by defendants as well as a motion by plaintiff and a cross motion by defendants for a preliminary injunction. *See Cayuga Indian Nation of New York v. Village of Union Springs, et al.*, 293 F.Supp.2d 183 (N.D.N.Y.2003).

On December 11, 2003, the Nation filed the present motion for summary judgment pursuant to Fed.R.Civ.P. 56, and thereafter, on January 21, 2004, defendants filed a cross motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a)(2).

Oral argument was heard regarding the pending motions on April 7, 2004 in Utica, New York. Decision was reserved.

## II. BACKGROUND

The Property is located within the 64,-015 acres that were the subject of extensive land claim litigation ("the Land Claim" or "Cayuga Land Claim"), to which the plaintiff and all defendants in this case were also parties.[2] *See Cayuga Indian Nation of New York v. Pataki, et al.*, 188 F.Supp.2d 223 (N.D.N.Y.2002) (*"Cayuga XVII "*). Plaintiffs [3] in that case sought a declaration of their ownership and right to possess the subject land, as well as monetary relief, based on certain land conveyances which they alleged violated the Non-

---

**1.** *See* 67 Fed.Reg. 46,328 (July 12, 2002).

**2.** Because all of the parties to this case were also parties to the Land Claim, they are bound by the determinations made therein. *See United States v. U.S. Currency in Amount of $119,984.00, More or Less*, 304 F.3d 165, 172 (2d Cir.2002), *citing Schiro v. Farley*, 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994).

**3.** The Land Claim action was commenced by the Nation in November 1980, and approximately one year later, the Seneca–Cayuga Tribe of Oklahoma ("the Tribe") successfully intervened. *See Cayuga Indian Nation of New York v. Carey*, Nos. 80–CV–930, 80–CV–960, 33 Fed.R.Serv.2d 272, 1981 U.S. Dist. LEXIS 15576 (N.D.N.Y. Nov. 9, 1981). An action similar to the present case is currently pending before the Honorable Neal P. McCurn in the Northern District of New York, wherein the Tribe is seeking declaratory and injunctive relief against the Governor and Attorney General of the State of New York, Town of Montezuma, Town of Aurelius, and County of Cayuga regarding their attempts to regulate the Tribe's construction of a bingo hall on land it purchased in fee simple, which is also located within the 64,015–acre Land Claim area. *See Seneca–Cayuga Tribe of Oklahoma v. Town of Aurelius, et al.*, 03–CV–690 (N.D.N.Y.). The Nation intervened as a defendant in that action by the Tribe, ostensibly to protect its sovereign interest in land within the claim area.

intercourse Act, now codified at 25 U.S.C. § 177. *See Cayuga Indian Nation of New York v. Cuomo*, 565 F.Supp. 1297, 1301 (N.D.N.Y.1983) (*"Cayuga I "*). According to the Land Claim plaintiffs, the historic Cayuga Indian Nation ("the Cayugas")[4] occupied the subject land "since time immemorial." *See Cayuga*, 565 F.Supp. at 1302. By a 1789 treaty with the State of New York, the Cayugas "cede[d] and grant[ed] all their lands to the People of the State of New York forever," and the State reserved to the Cayugas "for their use and cultivation" approximately 64,000 acres near Cayuga Lake. *See Cayuga Indian Nation of New York v. Pataki*, 165 F.Supp.2d 266, 315, 322 (N.D.N.Y.2001) (*"Cayuga XVI "*). In 1790, Congress enacted the Nonintercourse Act, which made illegal any land transaction with an Indian nation or tribe that was not ratified by the United States. *See* 25 U.S.C. § 177 (2003).

Thereafter, by the 1794 Treaty of Canandaigua, the United States recognized the approximately 64,000–acre area as the Cayugas' reservation. *See Cayuga XVI*, 165 F.Supp.2d at 328. The Land Claim court specifically held that the Treaty of Canandaigua conferred treaty-recognized title in the subject land to the Cayugas. *See Cayuga Indian Nation of New York v. Cuomo, et al.*, 758 F.Supp. 107, 115 (N.D.N.Y.1991) (*"Cayuga IV "*). In 1795 and 1807, the Cayugas' reservation land was sold to the State of New York. *See Cayuga Indian Nation of New York v. Cuomo*, 730 F.Supp. 485 (N.D.N.Y.1990)

(*"Cayuga III "*). Those conveyances were never ratified by the United States,[5] however, and as such, the court in the Land Claim held that they were in violation of the Nonintercourse Act, and thus are void *ab initio*, as though they never occurred. *See Cayuga Indian Nation of New York v. Pataki*, 79 F.Supp.2d 78, 84 (N.D.N.Y. 1999) (*"Cayuga XII "*); *Cayuga III*, 730 F.Supp. at 492–493. Although the Land Claim defendants were found liable for Nonintercourse Act violations, the court held that ejectment was not an available remedy, limiting plaintiffs' remedy solely to monetary damages. *See Cayuga Indian Nation of New York v. Cuomo*, Nos. 80–CV–930, 80–CV–960, 1999 WL 509442, at *30 (N.D.N.Y. July 1, 1999) (*"Cayuga X "*). After the Land Claim court, in the interest of efficiency, agreed to separate trials regarding damages, a jury awarded damages against the State defendants in the amount of $36,911,672.62, and the court thereafter awarded $211,000,326.80 in prejudgment interest. *See Cayuga XII*, 79 F.Supp.2d at 74–77; *Cayuga XVII*, 188 F.Supp.2d at 228. An appeal to the Second Circuit Court of Appeals in the Land Claim case is currently pending. *See Cayuga Indian Nation of New York v. Pataki*, 02–CV–6111 (2d Cir.).

On April 28, 2003, the Nation reacquired the Property in fee simple by indenture and thereafter began renovations to a portion of the Property located at 271 Cayuga Street in Union Springs. *See* Compl. at ¶¶ 23, 27; Aff. of Clint Halftown, Oct. 17,

---

**4.** After the American Revolution, the historic Cayuga Indian Nation dispersed into three separate factions. *See Cayuga Indian Nation of New York v. Pataki*, 165 F.Supp.2d 266, 309 (N.D.N.Y.2001) (*"Cayuga XVI "*). The majority of Cayuga joined the Seneca near Buffalo, New York, another faction fled to Canada, and the minority of Cayuga remained near Cayuga Lake. *See id.* The Cayuga Nation of New York, plaintiff in this action as well as in the Land Claim, and the Seneca–Cayuga

Tribe of Oklahoma, plaintiff-intervenor in the Land Claim, contend they are descendants of the historic Cayuga Indian Nation, hereinafter referred to collectively as "the Cayugas."

**5.** In the Land Claim, the court dismissed defendants' assertion that the United States ratified the 1795 and 1708 conveyances by the 1838 Treaty of Buffalo Creek. *See Cayuga III*, 730 F.Supp. at 492–493.

2003, ¶ 5. Defendant, Cayuga County designates the parcel as 141.05–1–3. *See* Aff. of Raymond J. Heslin, Dec. 11, 2003, Ex. B. On October 9, 2003, and October 15, 2003, the Village of Union Springs ("the Village") issued to the Nation Stop Work Orders and Orders to Remedy Violations, citing violations of zoning ordinances and local laws. *See* Halftown Aff., Ex. B. The Orders to Remedy Violations contained language that directed the Nation to remedy the alleged violations and give written notice to the Village in compliance with the applicable provisions of law before October 20, 2003 and October 25, 2003, respectively, or be subject to punishment in the form of a fine and/or imprisonment. *See* id.

On October 20, 2003, the Nation filed the present suit. The complaint sets forth a claim for declaratory relief, seeking a declaration that (1) the Property is Indian Country pursuant to 18 U.S.C. § 1151(a), and as such, the Nation possesses jurisdiction and the right to self government thereon; (2) defendants are without authority to enforce "zoning and land use laws, ordinances, rules, regulations or other requirements which seek or purport to regulate, control, or otherwise interfere with activities by or on behalf of the Nation occurring on the Property"; and (3) defendants efforts to do so are null and void. The Nation also seeks an injunction enjoining defendants from applying or enforcing any "zoning and land use laws, ordinances, rules, regulations or other requirements which seek or purport to regulate, control, or otherwise interfere with activities by or on behalf of the Nation occurring on the Property" including the commencement of any actions to apply or enforce said laws, and mandating that defendants void and rescind all documents issued or acts taken to apply or enforce said laws. Finally, the Nation seeks attorneys fees and costs as well as sanctions against defendants.

With the filing of its complaint, the Nation contemporaneously sought an order to show cause why defendants should not be preliminarily enjoined from applying or enforcing their zoning and land use laws against the Nation regarding renovations to the Property and a temporary restraining order ("TRO") pending a hearing on same. The Nation's request for an order to show cause was granted, and *sua sponte* a TRO was issued against the Nation, enjoining it from further construction, renovation, or demolition activities on the Property pending a hearing regarding the preliminary injunction motion. On October 29, 2003, defendants filed a counterclaim seeking declaratory and injunctive relief against plaintiff, along with a cross motion for dismissal and/or a preliminary injunction. Defendants' counterclaim seeks a declaration that (1) there is currently no Cayuga reservation in the State of New York; (2) neither the Property nor any other land referred to by the 1789 treaty between New York and the Cayugas is currently Indian Country; (3) the Nation does not have jurisdiction or the right to self government over the Property; and (4) the Property is subject to defendants' zoning and local land use laws. By their counterclaim, defendants also seek an order enjoining the Nation "from carrying out or causing to be carried out any construction on the [Property] without obtaining all permits and approvals required by the Village's Zoning Ordinance and local land use laws." The Nation thereafter requested that defendants' counterclaim be dismissed due to tribal sovereign immunity. On November 28, 2003, all of the aforementioned motions, as well as the Nation's request for sanctions, were denied. *See Village of Union Springs,* 293 F.Supp.2d 183.

Two weeks later, the Nation filed the present motion for summary judgment on its declaratory judgment claim, seeking a

declaration that the Property is Indian Country pursuant to 18 U.S.C. § 1151(a); that it is exempt from state and local regulation; and thus it is entitled to injunctive relief. On December 22, 2003, upon agreement of the parties, it was ordered that pending a hearing on the summary judgment motion, the parties shall maintain the status quo regarding construction/renovation to the Property or any attempts to regulate thereof, except that the Nation was allowed to take certain steps to winterize same. Defendant filed the cross motion for a preliminary injunction enjoining the Nation from conducting any gaming on the Property until it complies with the requirements of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–2721.

## III. DISCUSSION

### A. Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Peck v. Public Serv. Mut. Ins. Co.*, 326 F.3d 330, 337 (2d Cir.2003). When deciding whether to grant a motion for summary judgment, "a court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir.2003), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the initial burden of demonstrating the absence of a genuine issue of material fact falls upon the moving party, once that burden is met, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Koch v. Town of Brattleboro, Vermont*, 287 F.3d 162, 165 (2d Cir.2002), *citing* Fed. R.Civ.P. 56(c).

■ As an initial matter, there is a dispute between the parties regarding the burden of proof. In *Oneida Indian Nation of New York v. City of Sherrill*, it was determined that "[i]n keeping with the strong policy of the federal government to protect Indian lands, once an Indian tribe makes out a prima facie case of prior possession or title to the property in dispute, the burden of proof rests upon the non-Indian to demonstrate otherwise." 145 F.Supp.2d 226, 242 (N.D.N.Y.2001), *citing Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 668–69, 99 S.Ct. 2529, 2538–39, 61 L.Ed.2d 153 (1979) (*citing* 25 U.S.C. § 194). Further, it was found that "[t]he burden of proof thus shouldered by the non-Indian questioning Indian title encompasses both the burden of producing evidence and the burden of persuasion." *Id.* Citing that language, the Nation argues that here, because it has established that it has title to the Property, both the burdens of production and persuasion shift to, and rest with, defendants to show otherwise. Defendants argue that 25 U.S.C. § 194 [6], cited by the Supreme Court in *Wilson*, is inapplicable in the present case because here there is no dispute that the Nation owns title to the Property, nor are defen-

---

6. Section 194, entitled "Trial of right of property; burden of proof," reads as follows:

In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership. 25 U.S.C. § 194 (2003).

dants, as municipalities, considered "white persons" within the meaning of the statute.

It is significant that here, as in *City of Sherrill*, a motion for summary judgment is presented by an Indian tribe against a municipality, and the issue presented is whether property owned in fee simple by an Indian tribe is Indian Country. In *City of Sherrill*, the Supreme Court's language in *Wilson* was relied upon to find that the burden of proof rested with the municipality, and the Court of Appeals for the Second Circuit affirmed, further substantiating that finding. *See id., aff'd in part and rev'd in part*, 337 F.3d 139 (2d Cir.2003). Therefore, here, as in *City of Sherrill*, the burdens of proof and production rest with defendants, the non-Indian parties questioning Indian title.

The Nation, citing Ninth Circuit precedent, also argues that should there be a determination that the Property is Indian Country, the burden of proof regarding whether exceptional circumstances exist to warrant the application of state and local law to the Tribe and its activities on the Property rests with defendants.[7] *See Gobin v. Snohomish County*, 304 F.3d 909, 917 (9th Cir.2002), *cert. denied*, 538 U.S. 908, 123 S.Ct. 1488, 155 L.Ed.2d 228 (2003). The Ninth Circuit in *Gobin*, in affirming the lower court's finding of summary judgment in favor of plaintiff tribe, held that regarding exceptional circumstances, "[n]ot only must the [municipality] explain why [its] interests are exceptional, but it must explain why [they] are exceptional for reservation fee lands, given the [municipality's] inability to regulate reservation lands held in trust." *Id.* Defen-

dants cite no authority whatsoever for their contrary argument that this burden rests with the Nation. Therefore, should an analysis be undertaken regarding whether exceptional circumstances exist which would allow local regulation of the Nation's activities on the Property, the burdens of proof and production regarding that issue will rest with defendants.

### B. *Indian Country*

■ "In general, 'Indian Country' refers to the geographic area in which tribal and federal laws normally apply and state laws do not." *City of Sherrill*, 337 F.3d at 153. Indian Country is defined by statute as follows:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (2003).[8] Because the Nation seeks a declaration that the Property is Indian Country pursuant to Section 1151(a) only, there is no need to address whether the Property is a dependent Indian community or an Indian allotment pursuant to subsections (b) and (c). *See* Compl. at 8.

---

7. In the first instance, however, the Nation opposes the use of the exceptional circumstances test here, arguing that once there is a finding that the Property is Indian Country, no further analysis is warranted and the Nation is entitled to summary judgment. *See infra* at 145.

8. "Although § 1151 is a criminal statute, it generally applies as well to questions of civil jurisdiction." *City of Sherrill*, 337 F.3d at 153 n. 11, *citing DeCoteau v. District County Court*, 420 U.S. 425, 428 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) (internal quotations omitted).

According to the Nation, it is undisputed that the Property is Indian Country based on (1) the decisions of the District Court and the Second Circuit Court of Appeals in *City of Sherrill*, 145 F.Supp.2d 226, *aff'd*, 337 F.3d 139 (2d Cir.2003); (2) various conclusions set forth in the Land Claim action (*see, e.g., Cayuga II*, 667 F.Supp. 938; *Cayuga* III, 730 F.Supp. 485); and (3) a determination of the Eastern Region Director of the Bureau of Indian Affairs (BIA).

Defendants argue that (1) to the extent a reservation was established for the Nation by the 1794 Treaty of Canandaigua, it was disestablished by the 1838 Treaty of Buffalo Creek; (2) the BIA lacks the authority to make the aforementioned determination; and (3) the *City of Sherrill* case was limited to the issue of real property taxation, such that even if there is a conclusion here that the Property is Indian Country, exceptional circumstances exist which would allow local regulation of the Nation's activity on the Property.

### 1. *City of Sherrill & Cayuga Land Claim Cases*

The Nation argues in the first instance that the Property is Indian Country based on the *City of Sherrill* decisions and rulings set forth in the Land Claim cases. Defendants argue that (1) at no time during the Land Claim litigation did the court find that the subject land is Indian Country; and (2) *City of Sherrill* is limited only to cases involving taxation, and not, as here, where an Indian tribe seeks to be free from state or local regulation of its activities on Indian Country. The former argument, although a correct statement, is not of assistance to defendants as the issue of Indian Country was not before the court in the Land Claim. The latter argument,

which is based on defendants' assumption that exceptional circumstances exist here to warrant the application of state and local laws to the Nation's activities on the Property, is unrelated to the issue of whether the Property is Indian Country. It appears that defendants' sole basis for their argument against a finding that the Property is Indian Country is that any reservation created for the Cayugas in New York was terminated in 1838 by the Treaty of Buffalo Creek. It should be noted that, although an alternative argument against a finding of Indian Country was set forth by defendants in opposition to the Nation's motion for a preliminary injunction, which was denied,[9] only those arguments presented by the parties in their moving papers and at oral argument regarding the present motions need be addressed here. Nevertheless, a brief discussion of the issue of the Indian Country status of the Property in light of the *City of Sherrill* decisions as well as the relevant rulings in the Land Claim is in order before a more in depth analysis is undertaken regarding the Buffalo Creek Treaty and the exceptional circumstances test.

In *City of Sherrill*, motions for summary judgment, among other things, were presented regarding whether certain parcels of land purchased in fee simple by the Oneida Indian Nation of New York ("the Oneida Nation") within lands reserved to it by the United States at the 1794 Treaty of Canandaigua, were Indian Country. *See City of Sherrill*, 145 F.Supp.2d at 231–234. Summary judgment was granted in favor of the Oneida Nation on this issue and the Second Circuit Court of Appeals affirmed. *See id.* at 254, *aff'd*, 337 F.3d at 167. The Nation contends that the present case is

9. Because neither party established the requisite showing of irreparable harm to prevail on their preliminary injunction motions, an analysis of the issue of Indian Country was unnecessary at that time. *See Village of Union Springs*, 293 F.Supp.2d at 198.

sufficiently similar to *City of Sherrill* to warrant the same result.

Initially, it is worth noting that the reservation status of the land at issue in the Cayuga land claim was confirmed by the United States in the 1794 Treaty of Canandaigua, as was the reservation status of the land at issue in the Oneida land claim. *See City of Sherrill,* 145 F.Supp.2d at 244; *Cayuga,* 758 F.Supp. at 115. Moreover, the parcels at issue in *City of Sherrill* were purchased in fee simple, as was the Property at issue here. *See City of Sherrill,* 145 F.Supp.2d at 232–233.[10]

 The court in the Land Claim held that where, as here, an Indian tribe holds treaty-recognized title in land, only Congress may divest the tribe of that title. *See Cayuga IV,* 758 F.Supp. at 115. Since Congress has not divested the Cayugas of their title to the land claim area, it stands to reason that the reservation status of that land remains in place to this day. Moreover, a formal reservation, as is the Property here, falls within the definition of Indian Country, and such status is not precluded when a tribe holds fee title to the land. *See City of Sherrill,* 145 F.Supp.2d at 241, *citing California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207 n. 5, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); id. at 246, *citing Sandoval,* 231 U.S. at 48, 34 S.Ct. at 6; *City of Sherrill,* 337 F.3d at 153–154, 156. Therefore, the Property is Indian Country, unless Congress has terminated the reservation sta-

tus of the subject land. *See DeCoteau v. Dist. County Court for the Tenth Judicial Dist.,* 420 U.S. 425, 444, 95 S.Ct. 1082, 1092–93, 43 L.Ed.2d 300 (1975).

### 2. Treaty of Buffalo Creek

Defendants argue that any reservation the Cayugas may have held in New York State was terminated in 1838 by the Treaty of Buffalo Creek. How defendants style this argument differs among the several submissions they have filed in this matter. In their opposition papers, for example, defendants argue that by entering into the Treaty of Buffalo Creek with the United States in 1838, and receiving payments thereunder, the Nation *relinquished* tribal jurisdiction of any lands it held in New York State, including the Property. In their answer, defendants assert, as an affirmative defense, that by entering into the 1838 Treaty of Buffalo Creek, the Cayugas *"abandoned, released and relinquished* any jurisdiction over any lands located in the State of New York." Answer ¶ 53 (emphasis added). In the next paragraph of their answer defendants assert that "[t]he 1838 Treaty of Buffalo Creek *disestablished* any Cayuga reservation that had or may have existed in the State of New York." Answer ¶ 54 (emphasis added). The foregoing bears mentioning here because, as defendants are well aware, in *Cayuga IV* it was found that where an Indian tribe possesses federally recognized title to land, abandonment is

---

10. Unlike here, however, in *City of Sherrill* the defendant argued that the parcels were not Indian Country "because they (1) were purchased in private transactions; (2) were not purchased from the federal government; (3) have not been set aside by the federal government for indian use; (4) are not superintended by the federal government; and (5) receive services not from the federal government, but rather from [the municipality]." 145 F.Supp.2d at 242. Defendant there also joined with amici curiae, Oneida Ltd., the

Counties of Oneida and Madison, and the State of New York to argue, as do defendants here, that the parcels were not Indian Country because the reservation at issue there was disestablished by the 1838 Treaty of Buffalo Creek. *See id.* at 248. Ostensibly because of the nature of the government action, to wit, real property taxation, the defendant in *City of Sherrill,* unlike defendants here, did not argue that exceptional circumstances existed to warrant the imposition of taxes.

not a legally sufficient defense to claims concerning that land. *See* 758 F.Supp. at 110. As there it was held that the Cayugas possessed treaty recognized title to the subject land, which became effective in 1794, defendants cannot now argue that the Cayugas abandoned said land, and thus, their rights to exercise tribal jurisdiction over the Property, by entering into the Treaty of Buffalo Creek in 1838. *See id.* at 115. *See also United States v. U.S. Currency in Amount of $119,984.00, More or Less,* 304 F.3d 165, 172 (2d Cir.2002), *citing Schiro v. Farley,* 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994).

 However, disestablishment, or diminishment, is a defense to claims regarding reservation land. *See Cayuga IV,* 758 F.Supp. at 110, *citing, inter alia, De-Coteau,* 420 U.S. at 444, 95 S.Ct. at 1092–93. *See also City of Sherrill,* 337 F.3d at 159–60. The power to terminate a tribe's reserved title by disestablishment or diminishment lies with Congress. *See id.* at 159, *citing Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 1166, 79 L.Ed.2d 443 (1984) ("Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.") Courts may not lightly infer congressional intent to terminate a reservation, and when interpreting legislative action regarding an Indian reservation, such intent must be "expressed on the face of the Act or be clear from the surrounding circumstances or legislative history." *Id.* at 160, *citing De-Coteau,* 420 U.S. at 444, 95 S.Ct. at 1092–93 (internal quotations and citations omitted).

 It is unclear whether release and relinquishment are available defenses to claims regarding treaty recognized reservation land. *See Canadian St. Regis Band of Mohawk Indians v. New York,* 278 F.Supp.2d 313, 347–348 (N.D.N.Y. 2003); *Oneida Indian Nation of New York v. New York,* 194 F.Supp.2d 104, 127 (N.D.N.Y.2002). However, in accordance with the federal government's policy toward protecting Indian tribes and their land, as evidenced by the Nonintercourse Act, independent release and relinquishment of reservation land, without congressional ratification of same, would be ineffective to terminate reservation status. *See, e.g., County of Oneida v. Oneida Indian Nation of New York,* 470 U.S. 226, 231, 105 S.Ct. 1245, 1250, 84 L.Ed.2d 169 (1985) (*Oneida II* ); *Solem,* 465 U.S. at 470, 104 S.Ct. at 1166. Therefore, because congressional intent to terminate the Cayugas' reservation is a necessary prerequisite to a finding of disestablishment *or* release and relinquishment, the analysis of defendants' argument regarding the Treaty of Buffalo Creek will be framed accordingly.

 In keeping with the unique trust relationship between the federal government and the Indians regarding Indian land, treaties regarding same are to be "construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *See City of Sherrill,* 337 F.3d at 158, *citing Oneida II,* 470 U.S. at 247, 105 S.Ct. 1245. Treaties with the United States regarding the disposition of Indian land must be interpreted in the same way as statutory language, that is to say, congressional intent to terminate Indian title must be clearly expressed. *See id., citing Hagen v. Utah,* 510 U.S. 399, 423 & n. 1, 114 S.Ct. 958, 971, 127 L.Ed.2d 252 (1994).

 According to defendants, summary judgment should not be granted to the Nation because issues of fact remain as to the intent of the parties entering into the Buffalo Creek Treaty, the subsequent treatment of the subject land by the federal government, and subsequent proceed-

ings by the Nation regarding the subject land, including actions to recover damages under Buffalo Creek. The Nation opposes a finding that the Treaty of Buffalo Creek terminated the Cayugas' reservation for the same reason as was held, in *City of Sherrill,* that Buffalo Creek did not terminate the Oneidas' reservation.[11] As previously mentioned, and as the Second Circuit in *City of Sherrill* found, the Supreme Court has set forth the standard for identifying clear expressions of congressional in-

11. Alternatively, the Nation contends that defendants' Buffalo Creek argument need not be considered because they are judicially estopped from raising same. A claim or defense brought in a subsequent proceeding is barred by the doctrine of res judicata if "[1] the prior action involved an adjudication on the merits, [2] the prior action involved the same parties or their privies and [3] the claims asserted in the subsequent action were (*or could have been*) raised in the prior action." *Bronx Household of Faith v. Board of Educ. of City of New York,* 331 F.3d 342, 362 (2d Cir.2003) (emphasis added).

The Nation first argues that, according to a previous determination set forth in the Land Claim, the Buffalo Creek Treaty did not serve to disestablish the Cayugas' reservation. Although there it was actually found that Buffalo Creek was not evidence of congressional *ratification* of the state treaties of 1795 and 1807, which were in violation of the Nonintercourse Act, *see Cayuga III,* 730 F.Supp. at 493, the Nation argues that because the Second Circuit Court of Appeals in *Oneida* held that the distinction between ratification and extinguishment is "a meaningless one," *see Oneida Indian Nation of New York v. Oneida County,* 719 F.2d 525, 539 (2d Cir.1983), the 1990 Land Claim ruling that Buffalo Creek did not ratify prior state treaties was, for all intents and purposes, a decision that Buffalo Creek did not extinguish the Cayugas' reservation status. Defendants argue that the Nation is taking the language from *Oneida* out of context and that the distinction referred to by the court as meaningless was actually the counties' attempt to distinguish its ratification argument from the Supreme Court's holding in *United States v. Santa Fe Pacific,* 314 U.S. 339, 346, 354, 62 S.Ct. 248, 251, 255, 86 L.Ed. 260 (1941) requiring "plain and unambiguous" congressional language to find extinguishment, because, the *Oneida* court found, both would serve to extinguish the Oneidas' title. *See* 719 F.2d at 539. Defendants are correct in so arguing. A discussion of the argument that Congress ratified prior state treaties via the Buffalo Creek Treaty entailed an entirely different analysis than is required to determine whether Congress disestablished the Cayugas reservation by that same treaty, even though an affirmative finding from either analysis would serve to extinguish the Cayugas' title.

Nonetheless, the Nation argues, even if the Buffalo Creek defense was not raised in the Land Claim, it may still be found, as was recently in *Seneca–Cayuga Tribe of Oklahoma vs. Town of Aurelius, et al., see* 03–CV–690, that defendants are estopped from raising the Buffalo Creek defense now since they could have, but failed to do so, in the Land Claim. Because, as is the case in *Town of Aurelius,* all of the parties here were parties in the Land Claim, Judge McCurn's decision is equally relevant here. In *Town of Aurelius* the municipal defendants argued that they should not be estopped from raising the issue of disestablishment by the Buffalo Creek Treaty because there was no final judgment against them in the Land Claim. Judge McCurn noted, however, that even though there was no judgment against municipal defendants as to damages, there was a judgment as to liability. Moreover, for the purposes of res judicata, Judge McCurn also noted that the judgment of liability against municipal defendants in the Land Claim was a final judgment, since the intent of the parties in pursuing damages solely against the State was simply to avoid redundancy. ("The fact that all of the defendants in the *Cayuga* land claim action ... which are also parties to this action, are parties to the appeal to the Second Circuit, substantiates the view that the judgment therein is final for purposes of res judicata or collateral estoppel. This is not a situation ... where the appropriate relief has not been determined.... There are no outstanding issues as to damages or any form of relief in the *Cayuga* land claim action." *See* 03–CV–690.) *See also* Heslin Aff., Ex. I. While the Nation's argument regarding judicial estoppel is compelling, its arguments against disestablishment are equally compelling, and therefore the merits will be considered.

tent. *See City of Sherrill,* 337 F.3d at 159, *citing Solem,* 465 U.S. at 470, 104 S.Ct. 1161. Although this standard was set forth in the context of a series of "surplus land act" cases, which analyzed whether unallotted lands opened for settlement to non-Indians were still Indian Country, it is equally applicable here, since the Court expanded the canons of Indian treaty construction in the context of determining, as here, whether reservation status was terminated by treaty. *See id.* at 159–160 *citing South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998); *Solem,* 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443; *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660(1977); *DeCoteau,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300. Initially, an examination of the treaty must be conducted to find "explicit reference to cession or other language evidencing the present and total surrender or all tribal interests [which] can be helpfully probative, particularly when buttressed by fixed compensation for the opened lands." *City of Sherrill,* 337 F.3d at 159, *citing Solem,* 465 U.S. at 470, 104 S.Ct. 1161. However, such language is "not a prerequisite for a finding of diminishment" and "an act's legislative history and the subsequent treatment of the land (including settlement patterns) may also suffice." *Id.* When the aforementioned elements, considered together, do not provide "substantial and compelling evidence of a congressional intention to diminish Indian lands, [a court is] bound by ... traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." *Id., citing Solem,* 465 U.S. at 472, 104 S.Ct. 1161.

■ Against this backdrop, an analysis of congressional intent surrounding the Cayugas' reservation and The Treaty of Buffalo Creek will begin first with the plain language of the Treaty. Generally, the Buffalo Creek Treaty "provided for the removal of several tribes of New York Indians from their lands in Wisconsin to territory west of the Mississippi River in what is now the State of Kansas."[12] *City of Sherrill,* 145 F.Supp.2d at 248, *citing* 7 Stat. 550. The Treaty specifically states that the New York Indians, including the Cayugas, "hereby cede and relinquish to the United States all their right, title and interest" to their lands in Wisconsin, and in consideration thereof, the United States agree to set aside land in Kansas "as a permanent home for all the New York Indians, now residing in the State of New York, or in Wisconsin, or elsewhere in the United States, who have no permanent homes ...." 7 Stat. 550, Arts. 1 & 2. Those tribes who "do not accept and agree to remove to [Kansas] within five years ... shall forfeit all interest in [those lands]." *Id.* Art. 3. The special provision for the Cayugas reads, in its entirety, as follows:

> The United States will set apart for the Cayugas, on their removing to their new homes at the west, two thousand dollars, and will invest the same in some safe stocks, the income of which shall be paid them annually, at their new homes. The United States further agree to pay to the said nation, on their removal west, two thousand five hundred dollars, to be disposed as the chiefs shall deem just and equitable.

*Id.* Art. 11.

The Second Circuit Court of Appeals affirmed the lower court's holding that the

---

**12.** Article 2 of the Treaty states that the Kansas land "is intended as a future home for ... [t]he Senecas, Onondagas, Cayugas, Tuscaroras, Oneidas, St. Regis, Stockbridges, Munsees, and Brothertowns residing in the State of New York." 7 Stat. 550, Art. 2.

Buffalo Creek Treaty did not serve to disestablish the Oneidas' reservation, despite the City of Sherrill's arguments that the text of the Treaty plainly and unambiguously evidences disestablishment. *See City of Sherrill*, 337 F.3d at 161–164. Article 13 of the Buffalo Creek Treaty sets forth the following provisions for the Oneidas:

> The United States will pay the sum of four thousand dollars, to be paid to Baptista Powlis, and the chiefs of the first Christian party residing at Oneida, and the sum of two thousand dollars shall be paid to William Day, and the chiefs of the Orchard party residing there, for expenses incurred and services rendered in securing the Green Bay country, and the settlement of a portion thereof; and they hereby agree to remove to their new homes in the Indian territory, as soon as they can make satisfactory arrangements with the Governor of the State of New York for the purchase of their lands at Oneida.

7 Stat. 550, Art. 13. Regarding the text of the Treaty as it relates to the Oneidas, the court found that nothing therein provides "substantial and compelling" evidence of a congressional intent to diminish or disestablish the reservation. *Id.* at 161. In so finding, the court distinguished prior Supreme Court decisions wherein "a textually grounded intention to diminish" was found based on language which reflected an Indian agreement to "cede, sell, relinquish and convey" opened lands, or which provided that "all the unallotted lands within said reservation shall be restored to the public domain." *Id.* at 160, *citing Yankton*, 522 U.S. at 344, 118 S.Ct. 789; *DeCoteau*, 420 U.S. at 441 n. 22, 95 S.Ct. 1082; *Rosebud Sioux*, 430 U.S. at 591 & n. 8, 97 S.Ct. 1361; *Hagen*, 510 U.S. at 412, 114 S.Ct. 958. The court also distinguished *New York Indians v. United States*, 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927 (1898), wherein the Supreme Court

noted that the Buffalo Creek Treaty contained explicit cession language regarding the Senecas and Tuscaroras by indicating an intent that those tribes should take immediate possession of lands in Kansas, but found no fixed time for removal was set forth regarding the Cayugas, Onondagas, or Oneidas. *Id.* at 160–61, *citing New York Indians* at 21 & 28, 18 S.Ct. 531. Finally, the court made note of the language in Article 3 of the Treaty, which contemplated that some tribes might not remove to Kansas, before concluding that the plain language of the Treaty "contains neither an obligation to remove nor any indication of a congressional intention to disestablish the Oneidas' New York reservation." *Id.* at 162.

The Treaty language relating to the Cayugas, which contains a promise by the United States to make certain payments "on their removing to their new homes at the west" is clearly not representative of a specific congressional intent that the Cayugas remove. 7 Stat. 550, Art. 11. This is so, especially when compared with the language therein relating to the Oneidas, wherein they "agree to remove to their new homes in the Indian territory, as soon as they can make satisfactory arrangements with the Governor of the State of New York for the purchase of their lands at Oneida," which has previously been held to also lack evidence of such an intent, and the language relating to the Senecas and Tuscaroras, wherein they agree to remove to Kansas within five years and to remain there, which has been previously held to evidence congressional intent for removal. *See New York Indians*, 170 U.S. at 21, 18 S.Ct. 531; *City of Sherrill*, 337 F.3d at 161. Moreover, unlike the language relating to the Oneidas, which contains a conditional promise to remove, or that regarding the Senecas and Tuscaroras, which contains a clear, unconditional promise to remove, the language regarding the Cayugas evidences

no promise to remove at all. *See* 7 Stat. 550, Arts. 10, 11, 13, 14. Instead, the United States is promising to pay certain sums to the Cayugas *if* they remove. Therefore, there is no substantial or compelling evidence in the text of the Buffalo Creek Treaty of congressional intent to terminate the Cayugas' reservation.[13]

Next, an analysis of legislative history and the subsequent treatment of the land is conducted in order to determine whether there was congressional intent to terminate the Cayugas' reservation by the Treaty of Buffalo Creek. *See City of Sherrill,* 337 F.3d at 159, *citing Solem,* 465 U.S. at 470, 104 S.Ct. 1161. Defendants contend that there are questions of fact regarding the historical context as well as the parties' intent and subsequent treatment of the land, and therefore, there can be no conclusion as a matter of law that the Cayugas' reservation was not terminated by the 1838 Treaty. However, since the Nation has met its burden of establishing that the Property is Indian Country, the defendants now have the burden to establish that there is a genuine issue for trial regarding same. *See supra* at 134–35. Although defendants have failed to identify the issue with any specificity except to make a blanket statement that questions of fact still exist, nonetheless, their assertions will be addressed.

First, regarding the historical context of the Treaty, in *City of Sherrill* it was held that where treaty language is unambiguous, as it is here, consideration of the historical context is unwarranted. *See* 145 F.Supp.2d at 251–252. Second, regarding the intent of the parties, the Nation makes an argument similar to an argument set forth by plaintiff in *City of Sherrill* that is equally as persuasive. *See id.* at 252. By the time of the 1838 Treaty, the Cayugas' reservation had purportedly been transferred to the State of New York via the 1795 Treaty of Cayuga Ferry. *See Cayuga XVI,* 165 F.Supp.2d at 332. Although said treaty was in violation of the Nonintercourse Act, *see Cayuga III,* 730 F.Supp. 485, nonetheless, as it relates to the intent of the parties in 1838, the Cayugas could not have intended to relinquish rights to land that they did not believe they held.[14] Finally, regarding subsequent treatment of the land, as was noted by both the District Court and the Second Circuit in *City of Sherrill,* the reason that non-Indians were able to move onto the land was because the tribes were illegally dispossessed of same. *See* 145 F.Supp.2d at 252, 337 F.3d at 164. Such treatment is not evidence of a congressional intent to terminate the Cayugas' reservation. *Id.*

---

**13.** The Second Circuit noted that the language in Article 2 of the Buffalo Creek Treaty which states that the land in Kansas is intended as a permanent home for all New York Indians who have no permanent homes is not applicable to the Oneidas because they, in fact, had a permanent residence in New York. *See* 337 F.3d at 161 n. 17. However, the court went on to say that even if the language were applicable to the Oneidas, it went no further than the language in Article 13 to evidence congressional intent to remove. *Id.* Therefore, to the extent the language in Article 2 is applicable to the Cayugas, it is likewise held that said language goes no further than that in Article 11 to evidence congressional intent to remove.

**14.** At oral argument, defendants attempted to further muddy the waters by arguing that in 1838, Congress could not have intended to preserve a reservation that the Cayugas themselves did not believe they held, as evidenced by the lack of cession language in the Buffalo Creek Treaty relating to the Cayugas. However, the applicable standard here is not substantial or compelling evidence of congressional intent to *preserve* the reservation, but substantial or compelling evidence of congressional intent to *terminate* the reservation. The lack of cession language in the Treaty of Buffalo Creek in no way evidences an intent by Congress to terminate the Cayugas' reservation in New York.

After consideration of both the plain language of the Buffalo Creek Treaty as well as the legislative history and subsequent treatment of the land relating thereto, there is no substantial or compelling evidence that said Treaty served to terminate the Cayugas' reservation. *See City of Sherrill*, 337 F.3d at 159, *citing Solem*, 465 U.S. at 470, 104 S.Ct. 1161. Therefore, because there has been no congressional act to terminate the reservation status of the Property, it remains within the Nation's reservation land, and as such, is Indian Country pursuant to 18 U.S.C. § 1151(a).

### 3. *Bureau of Indian Affairs Letter*

Also in support of its motion, the Nation submits a letter it received from Franklin Keel, Director of the Eastern Region of the BIA, United States Department of the Interior (DOI) (hereinafter referred to as "the Keel letter"). The letter, dated November 4, 2003, is addressed to Clint Halftown, Chief of the Cayuga Nation. The relevant contents of the letter are as follows:

> This letter is in regards to our meeting with you on October 28, 2003, in which you requested a letter from Eastern Regional Office (ERO) in which (sic) points out how the ERO views Cayuga Nation (Nation) owned lands.
>
> The history of Indian lands in the State of New York is quite unique. Not only is land where the Nation owns land, i.e. Town of Springport, County of Cayuga and Town of Seneca Falls, County of Seneca, is located (sic) *not* held in trust by the United States, but there are no Indian lands held in federal trust in the State of New York. It is our position that the land in question is located within the limits of the Nation's reservation and under the jurisdiction of the BIA. The lands are therefore also under the jurisdiction of 25 United States Code (U.S.C.) § 177.

Aff. of Raymond J. Heslin, Dec. 11, 2003, Ex. C (emphasis included in original).

The Nation contends that the position of the BIA set forth in the Keel letter confirms its sovereignty and federally-recognized title to the Property, and confirms that the Property is Indian Country. The Nation apparently assumes this conclusion is self evident from a reading of the Keel letter because it provides no further explanation of same, and instead simply cites the rules of law that (1) the DOI and BIA have the power to promulgate regulations and policies regarding Indian affairs; and that (2) courts must defer to BIA determinations regarding the Nation and the Property. *See Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072–1073, 39 L.Ed.2d 270 (1974); *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1865); *United States v. Sandoval*, 231 U.S. 28, 46, 34 S.Ct. 1, 5–6, 58 L.Ed. 107 (1913); *Miami Nation of Indians of Indiana v. U.S. Dep't of the Interior*, 255 F.3d 342, 346–47 (7th Cir.2001); *Western Shoshone Business Council v. Babbitt*, 1 F.3d 1052, 1057 (10th Cir.1993); *James v. U.S. Dep't of Health and Human Servs.*, 824 F.2d 1132, 1137 (D.C.Cir.1987); *Price v. Hawaii*, 764 F.2d 623, 628 (9th Cir. 1985).

As defendants correctly note, while it is true that *Morton v. Ruiz* recognizes the rule that the DOI and BIA have the power to promulgate rules and policies regarding Indian affairs, the remaining cases cited by the Nation do not support its argument that the BIA has the authority to determine whether land held in fee simple by an Indian tribe should be considered Indian Country. Instead, those cases simply set forth the rule that courts should defer to executive and legislative determinations of tribal status. Moreover, defendants argue, determinations regarding whether

land is Indian Country are reserved for the courts, not the BIA.

In support of this argument, defendants refer to DOI regulations governing land acquisitions, and more specifically, to selected language of the section therein regarding its overall purpose and scope:

> These regulations set forth the authorities, policy, and procedures governing the acquisition of land by the United States in trust status for individual Indians and tribes. Acquisition of land by fee simple status is not covered by these regulations even though such land may, by operation of law, be held in restricted status following acquisition.

25 C.F.R. § 151.1 (2003). Defendants point out that there are no procedures in place for the BIA to determine whether land purchased in fee simple by a tribe is held in restricted status.

The Nation posits that the authority for the BIA's determination in this case stems from its close involvement with the *Cayuga* Land Claim litigation for over twenty years. However, defendants argue that, according to BIA regulations, determinations regarding the status of land owned by Indian tribes and/or individual Indians must be made based on a review and consideration of an administrative record consisting of certain items, including in some instances, consultation and input from local governmental agencies. Therefore, according to defendants, because the Keel letter fails to set forth the administrative record upon which the determination is based, the contents of the letter must be deemed to be Keel's personal views and not those of the BIA, and as such are not deserving of judicial deference. In rebuttal, the Nation points out that the Keel letter cannot be interpreted to state Keel's personal views because it expressly states that the views represented therein are those of the Eastern Region of the BIA, and therefore, the letter invites judicial deference.

Unfortunately, defendants fail to provide a citation for the aforementioned regulation(s) regarding the requirement for an administrative record to support a determination of the status of land owned by Indian tribes. The most that can be gleaned from review of the regulations is a section entitled "Title Status Reports" within the Part governing "Land Records and Title Documents," which does not refer to consideration of an administrative record. *See* 25 C.F.R. § 150.8.

Admittedly, the contents of the Keel letter are somewhat persuasive. However, given the foregoing conclusion that the Property is Indian Country based on rulings set forth in the *City of Sherrill* and *Cayuga* Land Claim cases, there is no need to determine whether judicial deference to the Keel letter is required in this case.

### C. *Exceptional Circumstances Test*

Defendants argue that even if there is a determination that the Property is Indian Country, the Nation is still subject to defendants' local zoning, building and land use regulations because exceptional circumstances exist which warrant that result. In support of their argument, defendants cite a series of Supreme Court decisions wherein they allege a "weighing test" was applied to reconcile the "plenary power of the States over residents within their borders with the semi-autonomous status of Indians living on tribal reservations." *Dep't of Taxation & Fin. v. Milhelm Attea Bros.*, 512 U.S. 61, 73, 114 S.Ct. 2028, 2034, 129 L.Ed.2d 52 (1994). *See also White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980); *Nevada v. Hicks*, 533 U.S. 353, 362, 121 S.Ct. 2304, 2311, 150 L.Ed.2d 398 (2001); *Okla-*

*homa Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 458, 115 S.Ct. 2214, 2220, 132 L.Ed.2d 400 (1995); *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 156, 100 S.Ct. 2069, 2083, 65 L.Ed.2d 10 (1980). The cited "weighing test" stems from the general rule set forth in *McClanahan v. State Tax Commission of Arizona* that state and local laws "are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided," 411 U.S. 164, 170–71, 93 S.Ct. 1257, 1261, 36 L.Ed.2d 129 (1973), and the exception set forth in *New Mexico v. Mescalero Apache Tribe* that "in exceptional circumstances, a State may assert jurisdiction over the on-reservation activities of tribal members," 462 U.S. 324, 331–332, 103 S.Ct. 2378, 2387, 76 L.Ed.2d 611 (1983).[15]

The Nation argues that where, as here, a municipality attempts to assert jurisdiction over an Indian nation or tribe, as opposed to an individual tribal member or non-members on Indian land, the balancing test is inapplicable. *Bishop Paiute Tribe v. County of Inyo,* 275 F.3d 893, 903 (9th Cir.2002), *vacated and remanded on other grounds, Inyo County v. Paiute–Shoshone Indians of the Bishop Community of the Bishop Colony,* 538 U.S. 701, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003). *Bishop Paiute* was a case which involved a Section 1983 claim by a tribe against a municipality arising from the execution of a search warrant to search tribal employee records as part of a welfare fraud investigation. *See* 275 F.3d at 897–898. The court there deemed a balancing test inapplicable in that instance, but noted that it is applicable to "state assertions of authority over non-members on reservations and

in exceptional circumstances over the on reservation activities of tribal members." *Id.,* citing *Mescalero,* 462 U.S. at 331–32, 103 S.Ct. 2378. While it took note of the Ninth Circuit's reasoning in declining to apply a balancing test, the Supreme Court vacated the opinion, not because of that reasoning, but because it found that an Indian tribe is not a "person" who may maintain a suit pursuant to Section 1983. *Bishop Paiute,* 538 U.S. 701, 123 S.Ct. at 1891, 1894; 42 U.S.C. § 1983 (2003).

Courts who have applied a balancing test to determine whether state or local taxation laws may be imposed to govern on-reservation activity have done so where state or local authority was being imposed on tribal members, *see Gobin v. Snohomish County,* 304 F.3d 909 (9th Cir.2002); *Segundo v. City of Rancho Mirage,* 813 F.2d 1387 (9th Cir.1987), tribal members and non-members, *see Mescalero,* 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611, and also where authority was imposed on a tribe and its members, *see California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). However, where, similar to here, a local government sought to impose its building or zoning ordinances to regulate the building activities of a tribe on its trust land, a court did not apply a balancing test. *See Colorado River Indian Tribes v. Town of Parker,* 705 F.Supp. 473 (D.Ariz. 1989). Instead, after a thorough analysis of the issue regarding whether the tribe's trust land had been diminished and a conclusion to the contrary, that court decided, without any analysis, that the local government was without authority to impose its building or zoning ordinances against the

---

15. It should be noted that in this regard the present case is wholly distinguishable from *City of Sherrill,* which involved the "special area of state taxation" and the "per se rule" prohibiting state taxation of "Indian reservation lands or Indian income from activities

carried on within the boundaries of the reservation." *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 214–15 n. 17, 107 S.Ct. 1083, 1091, 94 L.Ed.2d 244 (1987) (internal citations omitted). *See also City of Sherrill,* 337 F.3d at 157.

tribe's activities thereon. *See id.* at 480. Here, defendant municipalities are seeking to assert authority over the on-reservation activities of the Nation and possibly its members. However, even if defendants seek to regulate the activities of tribal members, as the following will make clear, they have nonetheless failed to meet their burden of establishing that exceptional circumstances exist to warrant imposition of said regulations to the Nation or its members.

Initially it should be noted that neither party cites, nor can there be found, any congressional provision which would allow state or local regulation of the Nation's or its members' activities on the Property.[16] In fact, the Treaty of Canandaigua, wherein the United States recognized the Cayugas' reservation, assures the Cayugas of their right to the "free use and enjoyment" of their reservation land. 7 Stat. 44. The Treaty is notably silent as to state or local regulation of the Cayugas, their members, or their activities on the reservation. *See id.*

■ Therefore, a balancing test will be conducted in order to determine whether exceptional circumstances exist to warrant state or local regulation of activities on the Property. Such a balancing test must be conducted against the backdrop of the traditional notions of Indian sovereignty as well as the strong federal policies of promoting tribal self government, which necessarily includes the "overriding goals" of furthering tribal self sufficiency and economic development. *Mescalero,* 462 U.S. at 335, 103 S.Ct. at 2386–87. *See also Cabazon,* 480 U.S. at 216, 107 S.Ct. at 1092. The extent to which state authority would interfere with these purposes is to be considered, but the state's regulatory interest is weighed substantially where it can identify how the on-reservation activity creates an impact off-reservation that would require state intervention. *See Mescalero* at 335–36, 103 S.Ct. at 2386–88.

■ Defendants argue that here, their interests in regulating use of the Property outweighs the Nation's interests in self-government. Specifically, defendants contend that they cannot ensure the health and safety of their citizens if the Nation is allowed to ignore fire and safety codes and generate excessive traffic that cannot be accommodated by the current surrounding road structure. For support of their argument, defendants cite *Puyallup Tribe, Inc. v. Washington Game Department,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), wherein the Supreme Court held that pursuant to a federal treaty, neither the tribe nor its members had exclusive rights to the fish passing through reservation land and that the state could regulate the exercise of the tribe's right to fish due to its interest in conserving an important natural resource. *See id.* at 176, 97 S.Ct. at 2623. However, as the *Mescalero* Court

---

**16.** The Nation cites a DOI regulation which, it argues, prohibits state and local regulation of its use of the Property. *See* 25 C.F.R. § 1.4. However, the cited regulation prohibits the application of

> the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating or controlling the use or development of any real or personal property . . . to any such property leased from or held or used under agreement with and belonging to any Indi-

an or Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States.

25 C.F.R. § 1.4(a) (emphasis added). Because the Property is not *leased from* the Nation nor is it *held or used under agreement with* the Nation, but is instead *owned by* the Nation and will allegedly be *used by* members of the Nation or the Nation itself, this regulation is inapplicable here. *Cf. Segundo v. City of Rancho Mirage,* 813 F.2d 1387, 1391 (9th Cir.1987).

noted, in *Puyallup*, all but 22 of the 18,-000–acre reservation at issue had been alienated in fee simple to non-tribal members. *See Mescalero*, 462 U.S. at 332 n. 15, 103 S.Ct. at 2385. Moreover, the treaty provision which qualified the tribal members' fishing rights by requiring that they be exercised "in common with all citizens of the Territory" operated to create a state interest in regulating the activities of its citizens. *Id.* Here, there is no such federal statute or treaty which would operate to establish local government regulation of activities on the Property, nor are there nonmembers residing on the Property whose activities defendants seek to regulate.

Citing *Mescalero*, defendants also contend that here, their interest in regulating activity on the Property is substantial because the Nation will depend on defendants' regulatory services and functions. *See Mescalero*, 462 U.S. at 341–342, 103 S.Ct. at 2387.[17] Defendants argue that the Nation's business venture on the Property will be supported by road maintenance and emergency services which would be provided by defendant, Village. Defendants note that in a letter regarding the Nation's former motion for a preliminary injunction, counsel for the Nation indicated that Class II gaming to be conducted on the Property would net the Nation a minimum daily profit of $14,000 to $17,000. *See* Aff. of Alan Peterman, Jan. 20, 2004, Ex. U. Such a large, on-reservation operation, defendants argue, would have a large impact on off-reservation municipal resources. The Nation replies that because of the nature of the gaming to be conducted, to wit, *electronic* bingo, a multitude of persons will not be using the Property, and as such, the impact on municipal resources will be minimal. *See* Aff. of Robert B. Zimmerman, Feb. 9, 2004.

At issue in *Mescalero* was whether *concurrent* state and tribal regulation was justified where the state failed to identify any regulatory function or service that it provided the tribe, and where the state did not contribute to the maintenance of the on-reservation natural resources it sought to regulate. *See* 462 U.S. at 338–342, 103 S.Ct. at 2388–2390. Here, defendants seek *sole* regulatory authority over the Nations's construction activities,[18] and unlike *Mescalero*, there is no assertion of concurrent jurisdiction. Also unlike *Mescalero*, though, defendants here identify several regulatory services they will provide the Nation, including emergency services and road maintenance. Keeping in mind the overriding federal goals of promoting tribal self sufficiency and economic development, however, the Court in *Mescalero* determined that loss of revenue to defen-

---

**17.** Ironically, defendants also cite *Gobin v. Snohomish County*, in support of their argument that consideration should be given to defendants' interests in, as here, regulating roads and sewers and maintaining compliance with health and safety codes, counterbalanced with the Nation's interest in self determination. *See* 304 F.3d 909 (9th Cir.2002). What defendants fail to mention is that in *Gobin*, the Ninth Circuit held that the county's interests were not exceptional enough to outweigh the tribe's interest. *See id.* at 917. As such, *Gobin* is more supportive of the Nation's argument than that of defendants'.

**18.** This is so, even though the Nation contends that it has adopted zoning and building ordinances that it alleges are at least as restrictive, if not more restrictive than that of defendants'. *See* Aff. of Gerald Jimerson, Oct. 30, 2003. Moreover, the Nation's Class II gaming ordinance, approved by the National Indian Gaming Commission (NIGC) on November 18, 2003, includes a promise by the Nation's chief to "construct, maintain and operate [its] Class II gaming facilities in a manner that adequately protects the environment and the public health and safety." *See* Peterman Aff., Ex. T. The NIGC has the power to enforce said ordinance, and can eventually issue an order of temporary closure for noncompliance. *See* 25 C.F.R. §§ 573.1, 573.6.

dants must be compared to the value to be generated by the tribe's on-reservation activities. *See id.* at 342–43, 103 S.Ct. at 2391. Here, defendants' loss of revenue from the provision of regulatory services cannot outweigh the potential for the Nation's economic development and self-determination.

Next, defendants argue that the Nation has failed to address its planned use for the Property, and that such information is vital to a determination of whether exceptional circumstances exist. This argument does not support defendants' position, however, as they, not the Nation, have the burden of proof regarding exceptional circumstances. *See supra* at 135. Nonetheless, defendants, referring to the Nation's letter regarding its expected revenue from Class II gaming on the Property, argue that the fact that the Property is located within 300 yards of the Union Springs Central School also weighs in favor of the imposition of their zoning regulations to activities thereon. *See* Aff. of Edward Trufant, Jan. 19, 2004 at ¶¶ 5, 10. The Nation correctly points out that it is governed by IGRA, which preempts state and local attempts to regulate gaming on Indian lands, and thus, such a consideration is irrelevant here.

Finally, defendants note that the facility located on the Property will be predominantly used by non-Indians. Defendants argue that they can regulate activities that occur on the Property which are directed at non-Indians, citing *Washington v. Confederated Tribes of the Colville Indian Reservation* in support thereof. *See* 447 U.S. 134, 159–60, 100 S.Ct. 2069, 2083, 65 L.Ed.2d 10 (1980). In *Colville*, the Supreme Court held that the state could impose a tax upon the on-reservation sales of cigarettes to non-tribal members, not

that it could regulate on-reservation activities which were used by non-members. However, the Nation correctly notes that in *Cabazon*, decided prior to enactment of the IGRA, the Supreme Court held that no exceptional circumstances were found to exist which would militate in favor of state regulation of high stakes bingo on a reservation, even though the activity was directed predominantly toward non-Indians. *See* 480 U.S. at 220–221, 107 S.Ct. at 1094. In fact, the Court there found that even the state's interest in the prevention of organized crime was not enough to override the federal goals of tribal economic development, tribal self-sufficiency, and strong tribal government. *See* id. Likewise, the fact that gambling activities will be conducted on the Property and will be directed toward non-Indians does not outweigh those federal goals.

After careful consideration of the aforementioned factors, it is clear that the overriding federal goals of promoting tribal self sufficiency and economic development outweigh the interests set forth by defendants. Moreover, Congress knows how to legislate to allow such regulation, but has failed to do so.[19] Therefore, because defendants have failed to meet their burden to show that exceptional circumstances exist to warrant enforcement of their regulations against the Nation or its members on the Property, and because the Property is Indian Country, the Nation's motion for summary judgment must be granted.

### D. *Preliminary Injunction*

Defendants move, "in the alternative," for a preliminary injunction enjoining the Nation from using the Property to conduct Class II gaming without first complying with the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–2702.[20] For a

---

**19.** "This litigation makes abundantly clear the necessity for congressional action." *City of Sherrill,* 145 F.Supp.2d at 231, *quoting Oneida II,* 470 U.S. at 253, 105 S.Ct. 1245.

**20.** "The IGRA divides gambling into three classes that correspond with different levels of

number of reasons, this motion must fail. As a procedural matter, once the Nation's motion for summary judgment is granted, defendants' counterclaims for declaratory and injunctive relief are necessarily dismissed, thus rendering defendants' instant motion for a preliminary injunction moot. Nonetheless, the Nation opposes this motion on different grounds: (1) that defen-

dants lack standing to seek injunctive relief based on IGRA, or, in the alternative; (2) that it has complied with IGRA.[21] Aside from the dubious nature surrounding the procedural propriety of defendants' motion, and although, as the Nation argues, there are certainly questions regarding defendants' standing to bring a claim under IGRA,[22] neither of the Nation's opposing

state regulation. Class I gaming includes social games for nominal prizes. 25 U.S.C. § 2703(6). This class of gaming is within the exclusive control of the tribes and is exempt from state control and IGRA regulations or prohibitions. Class II gaming is more explicitly defined as including bingo, cards and lotto. A tribe may engage in, or license and regulate, Class II gaming on Indian lands so long as 'such Indian gaming' is located within a State that permits such gaming, such gaming is not prohibited by federal law, and the governing body of the Indian tribe adopts an ordinance or resolution that is approved by the Chairman of the National Indian Gaming Commission. See 25 U.S.C. § 2710(b)(1). Class III gaming is defined under IGRA as simply 'all forms of gaming that are not Class I gaming or Class II gaming.' 25 U.S.C. § 2703(8)." *State of New York v. Oneida Indian Nation of New York,* 78 F.Supp.2d 49, 51–52 (N.D.N.Y.1999).

21. The Nation also expresses a concern that defendants' answer fails to provide notice to the Nation of defendants' alleged IGRA claim. *See Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Defendants' counterclaim sets forth a cause of action based upon violations of local zoning ordinances, laws and regulations and seeks a declaration that (1) the Property is not the Nation's reservation land, (2) the Property is not Indian Country, (3) the Nation lacks tribal jurisdiction over the Property, and (4) the Nation is subject to defendants' local zoning ordinances, laws and regulations regarding activities on the Property. *See* Answer at ¶¶ 57–91. Additionally, defendants seek an injunction enjoining the Nation from carrying out any construction on the Property without first obtaining the necessary permits. *See id.* As part of their counterclaim, defendants allege that the Union Springs Village Clerk received an anonymous telephone call whereby he learned that the Nation was planning to

open a gaming operation on the Property. *See id.* at ¶ 86. Thereafter, according to defendants, the Village Clerk called the National Indian Gaming Commission and discovered that the Nation had in fact submitted a tribal gaming ordinance. *See id.* In support of their motion for a preliminary injunction, defendants argue that the Nation has violated IGRA by not obtaining a determination from the Department of the Interior that the Property is "Indian lands" within the definition of the statute. Based on the foregoing, it is questionable whether a liberal reading of defendants' counterclaim would elicit any set of facts which would provide the Nation with notice of this claim or its grounds. *See In re Initial Public Offering Securities Litigation,* 241 F.Supp.2d 281, 323 (S.D.N.Y.2003), citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). However, this issue need not be reached as defendants have failed to meet the standard to prevail on their motion for a preliminary injunction.

22. The Nation cites several cases in support of its argument that there is no implied private right of action in IGRA, although none of them are cases where, as here, a municipality is asserting a claim against a tribe. *See Florida v. Seminole Tribe of Florida,* 181 F.3d 1237, 1249–49 (11th Cir.1999). *See also Hein v. Capitan Grande Band of Diegueno Mission Indians,* 201 F.3d 1256, 1260 (9th Cir.2000); *Hartman v. Kickapoo Tribe Gaming Comm'n,* 176 F.Supp.2d 1168, 1175 (D.Kan.2001), *aff'd,* 319 F.3d 1230 (10th Cir.2003); *American Greyhound Racing Inc. v. Hull,* 146 F.Supp.2d 1012, 1053 (D.Ariz.2001), *vacated on other grounds,* 305 F.3d 1015 (9th Cir. 2002); *Jimi Dev. Corp. v. Ute Mountain Ute Indian Tribe,* 930 F.Supp. 493, 498 (D.Colo. 1996); *Montgomery v. Flandreau Santee Sioux Tribe,* 905 F.Supp. 740, 744 (D.S.D.1995); *Davids v. Coyhis,* 869 F.Supp. 1401, 1410 (E.D.Wis.1994).

arguments need be addressed because defendants have not made the requisite showing of irreparable harm necessary to prevail on a preliminary injunction motion.

 Generally, in order to obtain a preliminary injunction, a party "must establish that it will suffer irreparable harm in the absence of an injunction *and* demonstrate either (1) 'a likelihood of success on the merits' *or* (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly' in the movant's favor." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996)(emphasis added). "[I]rreparable harm is '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir.2002). In order to make an adequate showing of irreparable harm, the moving party must establish that injury is likely, which is to say harm is "actual and imminent, not remote or speculative." *Id.* Moreover, for an injury to be deemed irreparable, "it must be the kind of injury for which an award of money cannot compensate," *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir.1982), and for which adequate redress cannot be reached by a trial on the merits, *see Kamerling*, 295 F.3d at 214.

 Defendants argue that they will suffer irreparable harm unless the Nation is enjoined from conducting Class II gaming without first complying with IGRA, because (1) defendant, Village will be deprived of "possible regulation and control" over the Property and (2) all defendants will be deprived of their right to participate in the IGRA procedures, which call for input from local governments concerning the possible impact of taking land into trust. *See* 25 U.S.C. § 2719(b)(1)(A). This argument fails, aside from the fact that the Property is not included within land taken into trust by the United States,

nor need it be in order to receive a gaming ordinance pursuant to IGRA. *See* 25 U.S.C. §§ 2703(4), 2710(b)(1). As was found in the parties' previous motions for a preliminary injunction, even where the alleged harm rises to the level of a deprivation of a constitutional right, courts will not find that irreparable harm exists absent a showing that the harm is of a type that cannot be compensated for monetarily. *See Village of Union Springs*, 293 F.Supp.2d at 195–198. Defendants' contention that the Village will be deprived of "possible regulation and control" of the Property is speculative. Moreover, it is questionable whether the alleged harm is sufficiently imminent to warrant injunctive relief. At this time, albeit due to its compliance with a TRO issued in this matter, the Nation has not yet commenced any gaming activities on the Property that could be considered an IGRA violation. Nonetheless, defendants have not made the required showing that the alleged harm cannot be compensated with monetary damages, and thus, their irreparable harm argument fails. Because irreparable harm is a prerequisite for the issuance of a preliminary injunction, defendants' motion must be denied.

As noted above, there also appears to be a number of other bases to deny a preliminary injunction to the defendants. However, in view of this ruling, same need not be specifically discussed.

### E. *Attorneys Fees and Sanctions*

In addition to declaratory and injunctive relief, the Nation also requests an award of attorneys fees and sanctions. However, it fails to cite any statutory authority to support such an award.

 Generally, attorneys fees "are not a recoverable cost of litigation absent explicit congressional authorization." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814–15, 114 S.Ct. 1960, 1965, 128

L.Ed.2d 797 (1994) (internal quotations and citations omitted). Here, the Nation presents its claims pursuant to the Indian Commerce Clause (U.S. Const.Art. I, § 8); U.S. Const. Art. II, § 2, clause 2; the Nonintercourse Act (25 U.S.C. § 177); the Treaty of Canandaigua (7 Stat. 44); 25 C.F.R. § 1.4; and federal common law. *See* Compl. ¶ 6. None of those alleged bases for its causes of action, however, provide explicit authorization for the imposition of attorneys fees.[23]

Nor are attorneys fees appropriate here pursuant to 28 U.S.C. § 1927. Section 1927 provides that attorneys fees may be awarded where opposing counsel "multiplies the proceedings in any case unreasonably and vexatiously." Id. "An award of attorneys fees ... pursuant to § 1927 is appropriate only where the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Abbott v. United States,* No. 96–CV–510, 2001 WL 670636, *1 (N.D.N.Y. Apr. 30, 2001) (citation and internal quotations omitted). Such is clearly not the case here. Finally, there is absolutely no basis for an award of sanctions against the defendants or their attorneys. *See Village of Union Springs,* 293 F.Supp.2d at 199.

For the foregoing reasons, the Nation's request for attorneys fees and sanctions must be denied.

## IV. *CONCLUSION*

The Property is Indian Country pursuant to 18 U.S.C. § 1151(a). The 1838 Treaty of Buffalo Creek did not disestablish the Cayuga reservation, nor did the Cayugas release and relinquish rights to the reservation by entering into said Treaty. As Indian Country, the Property, and any activities thereon, may not be regulated by defendants. There are no exceptional circumstances which would warrant such regulation in this case. Therefore, the Nation's motion for summary judgment must be granted and defendants' counterclaims must be dismissed. The defendants are not entitled to a preliminary injunction. The Nation is not entitled to attorneys fees or sanctions.

Therefore, it is

ORDERED that

1. The plaintiff Cayuga Indian Nation of New York's motion for summary judgment is GRANTED;

2. The defendants Village of Union Springs, Town of Springport, and County of Cayuga, New York's motion for a preliminary injunction is DENIED;

3. The defendants Village of Union Springs, Town of Springport and County of Cayuga, New York's counterclaims are DISMISSED;

4. The Property or parcel of land designated by the County of Cayuga as 141.05–1–3 is Indian Country pursuant to 18 U.S.C. § 1151(a);

5. The defendants Village of Union Springs, Town of Springport and County of Cayuga, New York and any of their boards, officers, agents, servants, employees, and any other persons acting on their behalf, are without authority or jurisdiction, and are preempted from, applying or enforcing defendants' zoning and land use

---

**23.** This is in contrast to *City of Sherrill,* wherein the Oneida Nation's claims were based in part on civil rights violations pursuant to 42 U.S.C. § 1983. *See* 145 F.Supp.2d at 237. An award of attorneys fees may be provided to a prevailing party in a civil rights case. *See id.* at 264, *citing* 42 U.S.C. § 1988.

However, even if the Nation's request here were considered pursuant to the § 1988 standard, said request would nonetheless be denied for basically the same reasons the Oneida Nation's request was denied in *City of Sherrill. See id.* at 266.

laws, or any other laws, ordinances, rules, regulations or other requirements which seek or purport to regulate, control, or otherwise interfere with activities by or on behalf of the plaintiff Cayuga Indian Nation of New York occurring on the Property, including building activities and/or land usage occurring on the Property, or from interfering with the plaintiff's ownership and possession of the Property;

6. The defendants Village of Union Springs, Town of Springport and County of Cayuga, New York, and any of their boards, officers, agents, servants, employees, and any other persons acting on their behalf are hereby ENJOINED and RESTRAINED from applying or enforcing defendants' zoning and land use laws, or any other laws, ordinances, rules, regulations or other requirements which seek or purport to regulate, control, or otherwise interfere with activities by or on behalf of the plaintiff Cayuga Indian Nation of New York occurring on the Property, including building activities and/or land usage occurring on the Property, or from interfering with the plaintiff's ownership and possession of the Property, including the commencement of any actions to apply or enforce said laws against the plaintiff; and are further ENJOINED to rescind and reverse all notices, Stop Work Orders, Orders to Remedy Violations, and other official documents or acts taken with respect to the enforcement of zoning and land use laws;

7. The plaintiff Cayuga Indian Nation of New York's request for attorney fees and sanctions is DENIED.

The Clerk of the Court is directed to enter judgment in accordance with this Memorandum–Decision and Order.

IT IS SO ORDERED.