Ellen M. PECK

v.

PUBLIC SERVICE MUTUAL INSURANCE COMPANY.

No. 3:99CV886 (JBA).

United States District Court, D. Connecticut.

March 24, 2005.

John W. Mills, Law Office of John W. Mills LLC, New Haven, CT, for Plaintiff.

Geoffrey Naab, LaBelle, LaBelle, Naab & Horvath, Manchester, CT, Oliver B. Dickins, Jr., Simbury, CT, for Defendant.

**Ruling on Renewed Motion for Summary Judgment [Doc. # 120]**

ARTERTON, District Judge.

On remand from the Second Circuit vacating a grant of summary judgment (Goettel, J.), defendant Public Service Mutual Insurance Company ("Public Service") renews its summary judgment motion. For the reasons discussed below, the defendant's motion is DENIED.

## I. Background

Plaintiff Ellen M. Peck ("Peck") owned and resided in a condominium located on the second floor of the Washington Market Building in South Norwalk, Connecticut. In May 1992, the South Norwalk Redevelopment Limited Partnership ("South Norwalk"), which owned the Washington Market Building, leased the street-level premises to Rattlesnake Ventures, Inc. ("Rattlesnake") for the operation of a restaurant called the Rattlesnake Bar and Grill. In October 1992, live rock and roll bands began performing at the Rattlesnake several nights a week, filling Peck's home with loud noise and vibration.

This case arises from a suit that Peck brought in Connecticut Superior Court against South Norwalk and others on June 23, 2004. South Norwalk was insured by Public Service, the defendant in this action, but never notified Public Service of the existence of the underlying state suit or of the fact that default judgment entered against South Norwalk on July 27, 1997. A jury found South Norwalk liable for $250,000 in damages on August 4, 1998. Peck subsequently entered into a settlement with South Norwalk, in which South Norwalk assigned to Peck any claims it had against Public Service, and Peck agreed not to pursue South Norwalk for any judgment.

In a decision issued by Judge Goettel on November 11, 2001, Public Service's motion for summary judgment was granted on grounds that South Norwalk failed to provide Public Service with timely notice of the claim, and that as a matter of law Peck failed to satisfy her burden of showing that Public Service was not materially prejudiced by the late notice. On appeal, the Second Circuit vacated the summary judgment, finding that "whether Public Service was 'ignorant' of the case giving rise to the default judgment and thus whether it was completely 'deprived of its right to defend' present unresolved questions of fact." *Peck v. Public Service Mutual Insurance Co.*, 326 F.3d 330, 338 (2d

Cir.2003). In particular, the Second Circuit noted that Public Service received notice of the action against South Norwalk through Rattlesnake's counsel in September 1995, which was "eight months after the policy was purchased (the earliest point at which notice could have been given) but almost two years before the default was entered," and pointed to additional evidence suggesting that Public Service was not ignorant of South Norwalk's involvement in the lawsuit. *Id.* at 338–39. The Second Circuit remanded for further proceedings consistent with its opinion, noting that its holding was "limited":

> We hold only that the District Court erred in deciding as a matter of law that Public Service did not have sufficient notice of Peck's claims against South Norwalk at any point prior to the entry of the default judgment based on the record before it; we express no opinion whether Public Service may on remand meet its burden as the moving party on a summary judgment motion to demonstrate the absence of a genuine issue of material fact on the material prejudice issue, based either on the same record and a different theory of prejudice, such as prejudice derived from the events prior to September 1995 (provided that the theory has not been waived in the district court), or on a more developed record responding to the showing Peck has made and clarifying the extent of the notice it received in September 1995. These are issues for the District Court to address in the first instance. Likewise, because the District Court declined to reach the contentions other than notice and prejudice advanced by Public Service in support of its motion for summary judgment, we express no opinion on them and remand them to the District Court.

*Id.* at 339 (citation omitted).

Public Service has now renewed its motion for summary judgment, and makes four core arguments. First, Public Service argues that plaintiff's claim arises out of an "occurrence" that did not occur during the policy period, because South Norwalk's insurance policy with Public Service did not go into effect until December 1, 2004, over five months after Peck brought suit against its insured, South Norwalk. Second, it argues that the notice received from Rattlesnake's counsel on September 12, 1995 was untimely because it came over eight months after the policy went into effect, and that Peck has not met her burden under *Aetna Casualty & Surety Co. v. Murphy*, 206 Conn. 409, 538 A.2d 219 (1988) of showing that Public Service was not materially prejudiced by this late notice. Third, defendant contends that it cannot be liable because South Norwalk assumed its own defense and failed to request coverage under the insurance policy. Finally, Public Service argues that because Peck's complaint in the underlying action did not allege either "bodily injury" or "property damage" that would trigger the policy's coverage, it cannot be liable for failing to defend under the policy.

## II. Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In moving for summary judgment against a party who will bear the burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."). In order to defeat summary judgment, the non-moving party must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

When deciding a motion for summary judgment, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). However, "[w]hen a motion for summary judgment is made and supported as provided in [the Federal Rules], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R.Civ.P. 56(e). Instead, the party opposing summary judgment must set forth the specific facts in affidavit or other permissible evidentiary form that demonstrate a genuine issue for trial. *See id.*

## III. Discussion

### A. Effective Date of Policy

On January 10, 1995, Public Service issued an insurance policy to Rattlesnake, naming South Norwalk as an additional insured, with a policy period running from December 1, 1994 to December 1, 1995. *See* Public Service Commercial Policy Package [Doc. # 124, Ex. 1]. Because the effective date of the policy was more than five months after Peck first filed suit against South Norwalk, Public Service argues that the occurrence giving rise to policy coverage fell outside the policy period, and therefore is not covered by the policy. Plaintiff's response is that the policy provided coverage because the injury to Peck continued well into the policy period. She notes that she amended her complaint in the underlying state action in June 1998, in which she alleged that "since October 1992, Ms. Peck has routinely and regularly been subjected to excessively loud music, vibration, and crowd noise several nights each week from the approximate hours of 9:00 p.m. until 2:00 a.m. the following morning," and that "[a]s a direct result of said improper use, South Norwalk Re-Development has caused Ms. Peck to suffer the following injuries on an ongoing, regular basis since October, 1992:"

a. Regular loss of sleep;

b. Needless anxiety and severe emotional distress;

c. Regular deprivation of her right to the peace, quiet and enjoyment of her home; and

d. Severe impairment to and diminution in the value of her dwelling place.

Amended Complaint, June 1, 1998 [Doc. # 124, Ex. 10].

In articulating their respective positions, defendant focuses on the date of the occurrence (which defendant, relying on *Plasticrete Corp. v. American Policyholders Ins. Co.*, 184 Conn. 231, 237 n. 5, 439 A.2d 968 (1981), defines as when first "the insured has or reasonably should have knowledge of the event"), while plaintiff relies on the ongoing nature of the resulting injury. The parties have not addressed the policy terms themselves, which ultimately control

which date governs coverage under the policy. Under the Commercial General Liability policy, Public Service agreed to pay "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages...." CGL Policy [Doc. # 124, Ex. 1] at § (I)(A)(1)(a).

Importantly, the policy also provides:

This insurance applies to 'bodily injury' and 'property damage' only if:

"(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and

(2) The 'bodily injury' or 'property damage' occurs during the policy period."

*Id.* at § (I)(A)(1)(b).

This provision requires that the "occurrence" take place within the "coverage territory," but imposes no requirement that the occurrence itself, as distinguished from the resulting injury, take place within the policy period. The absence of the term of art "occurrence" in subsection (b) is significant, particularly when the immediately preceding subsection uses clear language to exclude coverage of an "occurrence" outside the geographic scope of the policy. Instead of the term "occurrence," subsection (b) uses the phrases "bodily injury" and "property damage" and the present tense verb "occurs" to describe the temporal scope of the policy. Construing the plain meaning of these terms, the policy does not require that the "occurrence" take place within the policy period, only that the resulting injury or property damage occur during the policy period.

The definitions of bodily injury and property damage under the policy provide further insight. The policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.* at § V(3). "Property damage" is defined as follows:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. *All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.*

*Id.* at § V(15) (emphasis added).

As Peck acknowledges, her property damage claim was solely for "loss of use" based on the deprivation of her right to quiet enjoyment of her home;[1] she did not claim any physical damage to her condominium unit. Thus, to the extent plaintiff's claim is based on property damage, a claim of ongoing injury into the policy period is insufficient, because the loss under the policy is deemed to occur "at the time of the 'occurrence'."

"Occurrence" is defined under the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at § (V)(12). The Connecticut Supreme Court has deemed such language unambiguous: "[T]he word occurrence ordinarily is understood to denote something that takes place, especially something that happens unexpectedly without design ... The un-

---

**1.** Defendant disputes that "loss of use" under the policy can mean deprivation of the right of quiet enjoyment, and argues that absent an allegation that Peck was unable to reside in her condominium, there can be no property damage claim. In light of the disposition of the property damage claim, it is unnecessary to resolve the scope of this term.

fortunate event causing personal injury [and thus the occurrence under the policy] is the exposure of people." *Metropolitan Life Ins. Co. v. Aetna Cas. & Sur. Co.,* 255 Conn. 295, 307–08, 765 A.2d 891 (2001) (citations and internal quotation marks omitted). As the Connecticut Supreme Court explained, moreover, the purpose of a continuous exposure clause

> is to combine claims that occur 'when people or property are physically exposed to some injurious phenomenon such as heat, moisture, or radiation . . . [at] one location.' 'The clause simply broadens . . . 'occurrence' beyond the word 'accident' to include a situation where damage occurs (continuously or repeatedly) over a period of time, rather than instantly, as the word 'accident' 'usually connotes.'

*Id.* at 311, 765 A.2d 891 (quoting *Champion Int'l Corp. v. Continental Cas. Co.,* 546 F.2d 502, 507–08 (2d Cir.1976) (Newman, J., dissenting)).

Although the parties have not directly addressed what constituted the occurrence in this case, it appears clear from the policy language that Peck's exposure to the loud music emanating from the Rattlesnake Bar and Grill would constitute one occurrence, not many.[2] As to the timing of that single occurrence, Connecticut law is clear that it is the first exposure to the harmful condition, or, at the latest, the time when the insured becomes aware of a claim of exposure to a harmful condition, that gives rise to liability under the policy. *See Metropolitan Life Ins. Co.,* 255 Conn. at 321, 765 A.2d 891 (adopting the reasoning of *In re Prudential Lines, Inc.* 158 F.3d 65 (2d Cir.1998) which concluded that "liability attached following the first exposure; each claimant's first exposure in the policy period was the final unfortunate

event that had caused injury, had given rise to the policyholder's potential liability, and had triggered the policy. Each claimant's later exposures were but a continuation of the same occurrence."); *see also Plasticrete Corp. v. Am. Policyholders Ins. Co.,* 184 Conn. 231, 237 & n. 5, 439 A.2d 968 (1981) (finding that a duty to give notice of an occurrence under the insurance policy "must be triggered by an identifiable event," and suggesting that the duty to give notice may be delayed "until the insured has or reasonably should have knowledge of the event.").

■ In light of the foregoing, the Court concludes that plaintiff's property damage claim is not covered under the policy, because Peck must be deemed to have lost the use of her property "at the time of the occurrence", that is, at the time of her first exposure to the harmful condition, in this case, the excessive noise that began emanating from the Rattlesnake in October 1992. South Norwalk became aware of Peck's claim no later than June 1994, when it was served with process of Peck's suit against it. Because South Norwalk's policy with Public Service did not go into effect until December 1, 1994, and the occurrence fell outside the policy period, there can be no coverage for a property damage claim.

The Public Service policy also covers "bodily injury," and such injury is not under the terms of the policy limited to the time of the occurrence. Thus, the Court reads the Public Service Policy to provide coverage for that portion of Peck's injury that can be deemed "bodily injury," so long as it "occur[red] during the policy period." § (I)(A)(1)(b). Peck's Amended Complaint, filed in June 1998, extended her period of injury into the policy period.

---

**2.** Neither side has argued that each exposure to the loud music constituted a separate oc-

currence. The continuous exposure language in the policy precludes such a formulation.

On the face of the policy, therefore, Public Service would be responsible for any bodily injury Peck sustained within the effective dates of the policy.

█ Public Service also argues that Peck's claimed injuries do not qualify as "bodily injury" within the meaning of the policy, because in her amended complaint in the underlying state court action, Peck alleged only "regular loss of sleep" and "needless anxiety and severe emotional distress." *See* CGL Policy [Doc. # 124, Ex. 1] at § V(3) (defining "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time"). In *Moore v. Continental Casualty Co.*, 252 Conn. 405, 746 A.2d 1252 (2000), the Connecticut Supreme Court held that an "allegation of emotional distress arising out of economic loss ... does not trigger a duty to defend under coverage for 'bodily injury' ", reasoning that "the word bodily as ordinarily used in the English language strongly suggests something physical and corporeal, as opposed to something purely emotional." *Id.* at 410, 746 A.2d 1252. While Peck's claimed emotional distress arose not from economic loss but from the excessive noise and vibrations intruding into her apartment, the source of her emotional distress cannot distinguish this case from *Moore*, given the plain meaning of the term "bodily injury."

█ Peck has also claimed as an injury her "regular loss of sleep," and Public Service argues that this too should be deemed non-bodily injury under the policy. The Court disagrees. In *Moore*, the Connecticut Supreme Court included "sleeplessness" among the "physical manifestations" of emotional distress that might themselves be covered as bodily injury.

*See id.* at 415, 746 A.2d 1252. Sleep is defined as "the natural usually regular suspension of consciousness during which the powers of the body are restored," *Webster's Third New International Dictionary Online* "sleep" at 1.a. (2002), and during which "the activity of the nervous system is almost or entirely suspended," *Oxford English Dictionary Online* "sleep" at 1.a. (2003).[3] With regular loss of sleep, therefore, the nervous system remains active and the body's powers are not being restored. Such a condition is not mental or emotional, but rather a physical condition directly relating to the body. Accordingly, this Court concludes that Public Service's policy covers "regular loss of sleep" as a "bodily injury."

### B. Known Loss

In its reply brief, Public Service raised the notion of "known loss" or "loss in progress," arguing that plaintiff should be deemed barred from obtaining coverage from Public Service because South Norwalk, having been sued, was fully aware of the risk of loss when it acquired insurance from Public Service, and failed to inform Public Service of the pending claim. Defendant argues that because an "occurrence" is by definition an unexpected or accidental event, and insurance is fundamentally "contractual security against possible anticipated loss," risk is an essential requirement of insurance coverage and policies are not meant to cover certainties. *See* Reply Memorandum in Support of Renewed Motion for Summary Judgment [Doc. # 133] at 19 (quoting *Epmeier v. United States*, 199 F.2d 508, 509–510 (7th Cir.1952)). In its broadest formulation, the rule would preclude coverage whenev-

---

**3.** *See also* William Shakespeare, *Macbeth*, Act II, scene II, line 36 ("Sleep, that knits up the ravell'd sleave of care, The death of each day's life, sore labour's bath, Balm of hurt minds, great nature's second course, Chief nourisher in life's feast.").

er an injury began prior to the inception of the insurance policy. *See, e.g. Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir.1982) ("The rule [that an insured cannot insure against something which has already begun] is based on the realization that the purpose of insurance is to protect insureds against unknown risks."). More narrowly, the known loss rule would preclude insurance coverage "for damage deliberately done before the inception of insurance, or for damage that has been fraudulently concealed from the insurer prior to the purchase of the insurance policy." *City of Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1152 (2d Cir.1989) (citing *Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 28–29 (1st Cir.1981); *Arley v. United Pac. Ins. Co.*, 379 F.2d 183, 187–88 (9th Cir.1967), *cert. denied*, 390 U.S. 950, 88 S.Ct. 1039, 19 L.Ed.2d 1140 (1968)).[4]

■■■ Connecticut courts have not addressed the "known loss" or "loss in progress" doctrine. "When there is an absence of state authority on an issue presented to a federal court sitting in diversity ... the federal court must make an estimate of what the state's highest court would rule to be its law." *Cunninghame v. Equitable Life Assur. Soc. of U.S.*, 652 F.2d 306, 308 (2d Cir.1981). Two initial considerations guide this court in analyzing this issue. First, in construing an insurance policy, the Connecticut Supreme Court makes clear that "unambiguous terms are to be given their plain and ordinary meaning," and any ambiguity that cannot be resolved by examining the parties' intentions is to

be "construed in accordance with the reasonable expectations of the insured when he entered into the contract," applying "the contra proferentem rule and interpret[ing] a policy against the insurer." *Metropolitan Life Ins. Co. v. Aetna Cas. and Sur. Co.*, 255 Conn. at 305–06, 765 A.2d 891 (2001). Second, the Connecticut Supreme Court interprets insurance policies so as not to effect a complete forfeiture of coverage wherever possible. For example, in an analogous context where an insured failed to comply with the notice provisions in the contract, the Connecticut Supreme Court found that the notice provision was not a "material part of the agreed exchange," and thus balanced the insured's interest in avoiding forfeiture of insurance coverage and the insurer's interest in having an opportunity for timely investigation of the claim. The court concluded that a proper balance would require a factual inquiry into whether the insurer was materially prejudiced by the insured's delay in giving notice of the event triggering insurance coverage. *See Aetna Casualty and Surety Co. v. Murphy*, 206 Conn. 409, 417–18, 538 A.2d 219 (1988).

Addressing a similar lack of authority regarding "known loss" or "known risk" defenses under New York law, the Second Circuit declined to conclude that New York courts would adopt a "known risk" theory, because "to do so might well swallow up the more narrow doctrines regarding (1) concealment and misrepresentation, and (2) damages that are 'expected' or 'intended' by the insured.[5]" *City of Johns-*

---

4. Public Service uses the phrases "known loss" and "known risk" interchangeably. The "known loss" defense is in fact much narrower than "known risk," as it looks to whether the loss itself, not merely the risk of loss, was known to the insured at the inception of the policy. *See Nat'l Union Fire Ins. Co. of Pitts-*

*burgh v. The Stroh Companies, Inc.*, 265 F.3d 97, 108 (2d Cir.2001).

5. The Public Service Insurance Policy includes an exclusion for " 'bodily injury' or 'property damage' expected or intended from the standpoint of the insured." Policy [Doc. # 124, Ex. 1] at § I(A)(2)(a). This provision does not form the basis of Public Service's

*town,* 877 F.2d at 1153; *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. The Stroh Companies, Inc.,* 265 F.3d 97, 108 (2d Cir.2001) (reaffirming rejection of existence of "known risk" doctrine under New York law).

■ This Court concludes that the Connecticut Supreme Court would likewise decline to so extend Connecticut law. While South Norwalk had already been named as a defendant in Peck's state suit at the time it was added as an additional insured to the Public Service policy, and thus knew that it was exposed to liability for Peck's injuries, at the time the policy commenced South Norwalk had not yet been found liable, nor had the amount of damages been established. South Norwalk was thus aware of potential *likely* losses, but not actual losses. This distinction is significant, particularly as South Norwalk was one of three defendants named in Peck's suit, each with potential liability, and Peck's injury was of an ongoing, recurring nature. This case is far removed from that reflected in the Connecticut Superior Court's unpublished decision in *Travelers Property Casualty v. H.A.R.T., Inc.,* No. CV980485730S, 2001 WL 649616 (Conn.Super.2001), in which an accident resulting in death occurred during a lapse in the insured's policy due to nonpayment of premiums, and the insured concealed the accident and made misrepresentations in an effort to obtain retroactive reinstatement of coverage.

While there is an important public policy in deterring misconduct or fraud by an insured, Public Service's conceptualization of the known loss doctrine is overbroad.

Public Service has not identified any misrepresentations by South Norwalk in its application for insurance coverage, and while the lawsuit had commenced at the time South Norwalk was added to the Public Service policy, judgment had not entered against South Norwalk, and given the risks and uncertainties of litigation, and the existence of other potentially liable parties, establishment of liability and damages cannot be deemed inevitable.

Considering a similar issue in which the insured was notified by the federal Environmental Protection Agency (EPA) that it was considered a "potentially responsible party (PRP)" prior to obtaining its insurance coverage, the California Supreme Court held:

> [I]n the context of continuous or progressively deteriorating property damage or bodily injury insurable under a third party CGL policy, as long as there remains uncertainty about damage or injury that may occur during the policy period and the imposition of liability upon the insured, and no legal obligation to pay third party claims has been established, there is a potentially insurable risk … for which coverage may be sought. Stated differently, the loss-in-progress rule will not defeat coverage for a claimed loss where it had yet to be established, at the time the insurer entered into the contract of insurance with the policyholder, that the insured had a legal obligation to pay damages to a third party in connection with a loss.

*Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.,* 10 Cal.4th 645, 42 Cal.Rptr.2d

---

summary judgment motion, however, and the Court sees no basis for construing this provision to apply to the facts at issue in this case, because there has been no claim that South Norwalk intended or expected to cause Peck's injury. An " 'expected or intended' claim requires consideration of whether, at the time

of the acts causing the injury, the insured expected or intended the injury, an inquiry that generally asks merely whether the injury was accidental." *Stonewall Ins. Co. v. Asbestos Claims Management,* 73 F.3d 1178, 1215 (2d Cir.1995).

324, 913 P.2d 878, 906 (1995) (en banc); *see also Stonewall Ins. Co.*, 73 F.3d at 1215–16 (finding "known loss" doctrine inapplicable because "[t]hough NGC was aware, prior to the inception of many of the policies, that its products risked asbestosis and cancer diseases and had received a large number of claims, it was highly uncertain ... as to the prospective number of injuries, the number of claims, the likelihood of successful claims, and the amount of ultimate losses it would be called upon to pay."); *Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 518 (3d Cir.1997) (limiting the known loss doctrine to "bar coverage only when the legal liability of the insured is a certainty").[6]

Moreover, in this case there is express, broad policy language providing coverage for injuries that *occur* during the policy period, not merely those that commence or first manifest themselves during the policy period. *Compare* Public Service Commercial General Liability Policy [Doc. # 124, Ex. 1] at § (I)(A)(1)(b) (coverage for injuries that "occur during the policy period") with Public Service Commercial Property Policy [Doc. # 124, Ex. 1] at Conditions § H(1) (covering loss or damage "commencing" during the policy period). None of the cases cited by defendant or located by this Court have applied the known loss

doctrine to cases in which the policy expressly provides, as Public Service's does, for coverage of injuries that "occur during the policy period," [Doc. # 124, Ex. 1] at § (I)(A)(1)(b), and in which there in fact were claimed injuries during the policy period. *Compare Appalachian Ins. Co.*, 676 F.2d at 63 ("Since the injuries to Liberty's employees occurred immediately upon the promulgation of Liberty's discriminatory employment policies the occurrence took place for purposes of coverage before August 1, 1971. Appalachian need not indemnify Liberty because the occurrence preceded the effective date of the insurance policy."). In light of the plain language of the Public Service policy and the clear Connecticut authority favoring nonforfeiture of coverage, this Court narrowly construes the known loss doctrine and declines to apply it to the facts of this case.

## C. Late Notice

Public Service also renews its argument that there is no policy coverage because South Norwalk did not timely notify it of Peck's claim against it.[7] Public Service acknowledges that it received notice from Rattlesnake's counsel on September 12, 1995 about Peck's suit[8]—which, as the

---

**6.** This case is closer than *Montrose Chem., Stonewall,* and *Pittston,* because here there was a single claimant, and a lawsuit not merely pre-litigation claims had been filed prior to the inception of the insurance policy. Nonetheless, because loss attributable to South Norwalk was not certain upon the filing of the lawsuit, this Court declines to extend the "known loss" doctrine to the facts of this case. This Court disagrees with the case-law from other jurisdictions suggesting that the known loss doctrine applies to a loss for which suit had been filed prior to the effective date of the policy. *See, e.g. Bartholomew,* 655 F.2d at 27.

**7.** The policy provides: "If a claim is made or 'suit' is brought against any insured, you

must: (1) Immediately record the specifics of the claim or 'suit' and the date received; and (2) Notify us as soon as practicable. You must see to it that we receive written notice of the claim or 'suit' as soon as practicable." CGL Policy [Doc. # 124, Ex. 1] at § IV(2)(b).

**8.** In remanding this case, the Second Circuit recognized that the notice Public Service received from Rattlesnake, the named insured under the policy, could satisfy the duty of South Norwalk, as the policy's additional insured, to provide notice of suit. The Second Circuit noted that some jurisdictions require that the insurer receive "actual notice that the other codefendant/coinsured was served with process" and that the record did not reveal whether Public Service received notice that

Second Circuit noted, was eight months after the policy was purchased but almost two years before the default was entered—but argues that Peck has not met her burden under *Aetna Casualty* of showing that Public Service was not materially prejudiced by the late notice. Addressing the consequence of late notice to an insurer, the Connecticut Supreme Court held:

> If it can be shown that the insurer suffered no material prejudice from the delay, the nonoccurrence of the condition of timely notice may be excused .... [T]he burden of establishing lack of prejudice must be borne by the insured. It is the insured who is seeking to be excused from the consequences of a contract provision with which he has concededly failed to comply.

*Aetna Casualty*, 206 Conn. at 418–20, 538 A.2d 219.

In remanding the case, the Second Circuit indicated that Public Service could move for summary judgment "based either on the same record and a different theory of prejudice, such as prejudice derived from the events prior to September 1995 ... or on a more developed record responding to the showing Peck has made and clarifying the extent of the notice it received in September 1995." *Peck*, 326 F.3d at 339. Public Service has not supplemented its record, and focuses instead on the 8 month lapse from the time the policy commenced and the 14½ month lapse from the time suit had been filed. Public Service argues that "[d]uring that critical period, it was imperative for a defendant to identify witnesses, investigate the facts, initiate discovery and initiate settlement negotiations," Reply Memorandum in Support of Renewed Motion for Summary Judgment [Doc. # 133] at 7, and notes that "South Norwalk apparently undertook no investigation, initiated no discovery, and made no effort to settle the case" during that period. *Id.* at 7 n. 6. While Public Service has not offered evidence regarding the status of the state proceeding at the time it received notice, it argues that summary judgment is appropriate because it has pointed to an absence of plaintiff's evidence regarding an issue on which she has the burden of proof.

The Second Circuit exhaustively described the timeline of events in the state court action:

> Five days after Peck's [June 23, 2004] complaint was filed, attorney G. Kenneth Bernhard of the Law Firm Goldstein and Peck, P.C. entered an appearance on behalf of "[a]ll defendants." On August 15, 1994, South Norwalk filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut. Two weeks later, Peck filed a Revised Complaint, and on October 6, Rattlesnake and Opper filed their answer. On December 6, 1994, attorney Paul L. McCullough filed a notice of appearance for South Norwalk. McCullough had represented South Norwalk in connection with the Rattlesnake lease .... It was not until January 10, 1995—more than six months after the underlying tort action was commenced and about

South Norwalk was served with process. The Second Circuit invited Public Service to present on remand "a more developed record ... clarifying the extend of the notice it received in September 1995." In renewing its summary judgment motion, Public Service resubmitted the earlier summary judgment record, adding only copies of Judge Goettel's and the

Second Circuit's decisions. As a result, whether the notice Public Service received in September 1995 satisfies the actual notice requirements remains an unresolved factual issue. For the purposes of its renewed summary judgment motion, Public Service acknowledges the September 1995 notice date.

five months after South Norwalk filed for bankruptcy—that Public Service, a New York corporation, issued an insurance policy to Rattlesnake, naming South Norwalk as an additional insured....

On January 23, 1995, the law firm of Gildea & Stevens, which had been retained by another Rattlensake insurer, Greater New York Mutual Insurance Company, filed a notice of appearance on behalf of Rattlesnake and Opper. On March 23, attorney Thomas E. Stevens of Gildea & Stevens filed an amended answer and special defense on behalf of Rattlesnake and Opper. The following month, Peck made an offer to Rattlesnake, agreeing to accept $75,000 in full settlement of her claims. The offer was rejected.

By letter dated September 8, 1995, attorney Eugene E. Cedarbaum of Goldstein and Peck, requested that Ronald Fitelson, Rattlesnake's insurance broker, notify Public Service of the underlying tort action. Four days later, Fitelson faxed to Public Service a Loss Notice and the Summons, which separately listed each defendant in the underlying action. Fitelson also instructed Public Service to contact attorney Cedarbaum. On September 14, Daniel Jaconetti, the head of litigation at Public Service, set up a claims file and filled out a "Claims Division Transaction Sheet." The following day, he opened a claims file in which he made handwritten notes about the claims alleged in Peck's complaint, and assigned the file to insurance adjuster Barry Blecher. As to the Ninth and Tenth Counts of the complaint, which alleged negligence per se and negligent infliction of emotional distress against South Norwalk, Jaconetti wrote "Possibly Depending upon lease Agr. and if Co–△ is ADD'l. INSD. on Policy." Jaconetti also wrote "Has Co–△ + Sought Def. + Indem. From Insd?" and "Has Anyone Answered For Co–△ Yet?"

On September 29, attorney Cedarbaum forwarded a copy of Peck's August 1994 Revised Complaint to Public Service. On October 5, Blecher faxed a two-page document to Cederbaum, asking him to identify South Norwalk and whether it was the landlord of the property leased by Rattlesnake. A week later, Blecher sent another letter to attorney Cederbaum confirming receipt of the original summons and complaint, the Revised Complaint, and explaining that he needed a copy of the lease to help Public Service determine its "position regarding the availability of coverage." On October 20 attorney Cederbaum sent Blecher copies of various papers pertaining to the litigation, and indicated that he would soon send a copy of the lease. Additionally, Cederbaum informed Blecher that "[t]he premises on which the restaurant is located is rented from South Norwalk" and that Peck's deposition was scheduled for October 26.

In early November, Public Service received a copy of the lease agreement. On November 28, Public Service sent a letter to Rattlesnake denying insurance coverage to Rattlesnake on the grounds that (1) the date of the loss was October 1992, prior to the 1994 effective date of the policy; (2) notice of the claim was not timely provided by Rattlesnake (over a year after service of the complaint); and (3) intentional acts were excluded from the policy's coverage. No disclaimer of coverage was ever sent to South Norwalk, and South Norwalk was not referred to in the letter....

On August 28, 1996—six months after the automatic stay in the South Norwalk bankruptcy proceeding was lifted with respect to Peck's action against South

Norwalk—Peck served South Norwalk with interrogatories and document production requests. South Norwalk failed to respond to these discovery requests, and by motion dated November 25, 1996, Peck moved for the entry of a default against South Norwalk. A copy of the notice was sent to attorney McCullough, among others. A default judgment was entered against South Norwalk on July 21, 1997.

In April 1997, Peck filed an offer of judgment to settle the case against South Norwalk for $25,000, which was never accepted. On May 29, 1998, attorney Brian M. Gildea of Gildea and Associates entered an appearance in the underlying action on behalf of "[a]ll defendants," although attorney McCullough had previously appeared for South Norwalk. On June 1, 1998, Peck filed an Amended Complaint that was substantially similar to the original complaint. The only difference was the addition of allegations pertaining to the injuries sustained by Peck.

At a July 1998 pretrial conference (at which attorney Gildea was in attendance), attorney McCullough indicated that he would not be participating in the trial because of his belief (later admitted by him to have been mistaken) that South Norwalk's liability to Peck had been discharged in the bankruptcy proceeding (which he believed had been converted from a Chapter 11 into a Chapter 7 proceeding). McCullough also indicated at the pretrial conference his belief that Peck's claim was covered by insurance, although he stated that he did not know the identity of the insurance company providing coverage. The Superior Court judge explained to McCullough that it was up to him and his client "to notify the insurance company" of the claim and that if the insurer wanted "to come in and ask for a continuance," the court would consider such a request. The court continued: "So if you could notify the insurance company as soon as possible I would appreciate it .... Actually not appreciated. I will order it." Notwithstanding this unequivocal "order," McCullough later admitted that he never notified Public Service.

Immediately upon overhearing the colloquy between the Superior Court judge and attorney McCullough concerning the notice to South Norwalk's insurer, attorney Gildea notified a claims handler at Public Service that the trial in the case was scheduled to commence shortly and that South Norwalk's counsel had been given permission not to attend. According to Gildea, the claims handler responded that Public Service "had closed [its] file on this matter, and had no intention of hiring defense counsel or taking any other steps to get involved in the litigation." The trial proceeded to verdict without South Norwalk's participation, Rattlesnake and Opper being defended by the two other insurers that insured only Rattlesnake, and McCullough testifying as a fact witness in Peck's rebuttal case. On or about August 4, 1998, the jury returned a verdict against the defendants, and awarded damages in the amount of: (1) $225,000 against Rattlesnake and Opper on the negligence per se claims; (2) $200,000 against Rattlesnake on the negligent or intentional infliction of emotional distress claims; (3) $200,000 against Opper on the negligent or intentional infliction of emotional distress claims; and (4) with respect to the default judgment against South Norwalk, $250,000.

*Peck*, 326 F.3d at 333–335 (footnotes omitted).

■ Based on this record, there remain issues of fact on the degree to which Public Service was prejudiced by the late notice. At the time Public Service received notice, discovery had not yet been completed, the default judgment had not yet entered, and trial remained three years away. Peck did not serve South Norwalk with interrogatories and document production requests until August 28, 1996, almost one year after Public Service received notice. It was the failure to respond to these discovery requests that precipitated the entry of default judgment on July 21, 1997, and because Public Service had notice prior to these events, this omission cannot be deemed the source of prejudice to Public Service. Similarly, Peck's offer of judgment to settle the case against South Norwalk was filed subsequent to the September 1995 notice, but Public Service made no effort to have the response time extended if it needed it. Given the slow pace at which the litigation proceeded, there would appear to have been ample time for Public Service to investigate the claim, conduct discovery, negotiate a settlement, and avoid the unfortunate effects of Mr. McCullough's representation, following its receipt of notice of the claim in September 1995. Public Service has identified no judicial action that occurred in the case prior to that date that would have prejudiced its ability to defend its insured. Moreover, as the Second Circuit noted, "there is no evidence in the record that Public Service would have acted differently from September 1995 forward if it had received the notice directly from South Norwalk, given the reasons Public Service gave for disclaiming coverage in its November 1995 communication with Rattlesnake." *Id.* at 339. Accordingly, on the record before the court, Public Service has not satisfied its burden of demonstrating the absence of a genuine issue of material fact on the material prejudice issue.

A question arises, however, as to whether the revised complaint that was sent to Public Service in September 1995, which alleges injuries "on an ongoing, regular basis since October 1992," put it on notice that there was a claim for bodily injury occurring within the policy period. The revised complaint was dated August 29, 2004, prior to the inception of the policy. While an amended complaint was filed on June 1, 1998, bringing Peck's injury into the policy period, that amended complaint was filed just one month prior to trial, when South Norwalk was already in default. The Second Circuit noted that "[w]hether the allegations in [the August 1994 revised complaint], combined with other information in the possession of Public Service, may serve as notice of conduct occurring after the complaint was filed presents both an unresolved question of Connecticut law and questions of fact that should be addressed by the District Court in the first instance ..." *Peck,* 326 F.3d at 339.

■ Neither party has directly addressed this issue. This Court concludes that Peck's allegations of ongoing, recurring injuries were sufficient to trigger a duty to defend. Because "[t]he duty to defend has a broader aspect than the duty to indemnify and does not depend on whether the injured party will prevail against the insured, [i]f an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured." *Imperial Cas. and Indem. Co. v. State of Connecticut,* 246 Conn. 313, 324, 714 A.2d 1230 (1998) (citations and internal quotation marks omitted) (alterations in original). The policy period began three months after the revised complaint was filed, and was therefore close enough in time to the allegations in the complaint that it would be reasonable to expect that the "ongoing" injuries

alleged would reach into the policy period, particularly as there was no indication in the complaint that Peck had moved from the residence that was the source of her injuries. Under these circumstances, it was reasonable to expect that plaintiff's evidence at trial would include injuries within the policy period, for which an amended complaint would be anticipated. The Connecticut Rules of Court permit such amendments to be made in the discretion of the trial judge.[9] In light of the expansive scope of the duty to defend under Connecticut law, the allegations in the August 1994 revised complaint were sufficient to put Public Service on notice that the injuries claimed were potentially within the coverage provided by the policy.

### D. South Norwalk's Assumption of Its Own Defense

■■■ Public Service argues that regardless of whether Public Service received notice from other entities, South Norwalk itself did not provide notice and assumed its own defense without soliciting assistance from Public Service. In the vacated summary judgment decision, Judge Goettel characterized this defense by McCullough as "if not a sham, an absolute disaster." November 11, 2001 Decision [Doc. # 125, Ex. 1] at 15. Whether Public Service received notice of the suit against South Norwalk directly from South Norwalk or from its co-insured/co-defendant Rattlesnake is not significant. The factual issue identified by the Second Circuit is whether Public Service received sufficient "actual notice" of the claim against South Norwalk. *See Peck*, 326 F.3d at 338–339 (citing *Campbell v. Cont'l Cas. Co.*, 170 F.2d 669, 671 (8th Cir.1948); *Indem. Ins. Co. v. Forrest*, 44 F.2d 465, 466 (9th Cir. 1930); 14 Couch on Insurance §§ 199:97 (2002)); *see also* Couch on Insurance § 199:98 (identifying courts that "recognize actual notice, regardless of source, as satisfying policy provisions requiring notice of suit or forwarding of suit papers, at least where actual notice is sufficient for the insurer to locate and defend the suit, and where the insured has not selected one insurer to provide an exclusive defense and there is no prejudice to the insurer."). This issue remains for trial. Assuming the September 1995 notice is valid as to South Norwalk, then, as discussed above, the allegations in Peck's complaint are sufficient to trigger a duty to defend. In such circumstances, the deficient conduct of attorney McCullough cannot absolve Public Service of its duty under the policy. *See Black v. Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 153, 681 A.2d 293 (1996) (" '[T]he [insurer], after breaking the contract by its unqualified refusal to defend, should not thereafter be permitted to seek the protection of that contract in avoidance of its indemnity provisions' ") (quoting *Missionaries of the Company of Mary, Inc. v. Aetna Casualty & Surety Co.*, 155 Conn. 104, 114, 230 A.2d 21 (1967)).[10]

---

**9.** Section 10–60 of the Connecticut Rules of Court provides that "(a) Except as provided in Section 10–66 [Amendment of Amount in Demand], a party may amend his or her pleadings or other parts of the record or proceedings at any time ... (1) By order of judicial authority; or (2) By written consent of the adverse party; or (3) By filing a request for leave to file such amendment ..." Section 10–62 provides: "In all cases of any material variance between allegation and proof, an amendment may be permitted at any stage of the trial. If such allegation was made without reasonable excuse, or if the adverse party was actually misled thereby to his or her prejudice in maintaining the action or defense upon the merits, or if such amendment requirements postponement of the trial ... such amendment shall be made only upon payment of costs or upon such terms as the judicial authority may deem proper ..."

**10.** Public Service relies on *Brown v. Employer's Reins. Corp.*, 206 Conn. 668, 539 A.2d 138 (1988), in which the Connecticut Supreme Court held the insured, not the insurer, liable

## IV. Conclusion

For the foregoing reasons, defendant's Renewed Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

for judgment in underlying civil action when the insured was defaulted by the trial court for its failure to appear at trial. The insurance policy at issue in *Brown*, however, required the *insured* to employ counsel to defend a suit, and provided only that the insurer would reimburse the insured after a covered loss was incurred.

While Public Service may defend on grounds that there was improper collusion between South Norwalk and Peck that led to the entry of default judgment and the resulting damages award, *see Black*, 239 Conn. at 303, 685 A.2d 305, this issue is a matter for trial.